CITY OF MACON, Plaintiff,

v.

Ray MARSHALL, United States Secretary of Labor, Defendant.

Civ. A. No. 77–155–Macon.

United States District Court,
M. D. Georgia,
Macon Division.

Oct. 28, 1977.

Andrew W. McKenna, Mitchel P. House, Jr., Macon, Ga., for plaintiff.

Denver L. Rampey, Jr., U. S. Atty., John D. Carey, Asst. U. S. Atty., M. D. Ga., Macon, Ga., David J. Anderson, R. Joseph Sher, Dept. of Justice, Washington, D. C., for defendant.

OWENS, District Judge:

Until March 15, 1973, Bibb Transit Company owned and operated a municipally

franchised bus transportation system which served the City of Macon. Its drivers and maintenance employees were members of and exclusively represented by Local Division 898 of the Amalgamated Transit Union, AFL–CIO, for collective bargaining purposes.[1]

Following notice that Bibb Transit Company because of monetary losses was ceasing its bus operations, the Mayor and Council of the City of Macon on February 28, 1973, formally approved[2] the city's purchase of Bibb Transit Company's buses and personal property, the rental of the company's Riverside Drive office-maintenance facility, the hiring of those Bibb Transit drivers who desired to make application to the city and the operation of a bus system by the city. Then Mayor Thompson in proposing all of this to the February 28, 1973, meeting of Mayor and Council stated ". . . The City will not become involved with any union."

On March 15 the city began operating its own bus transit system. Except for two drivers physically disqualified and five drivers who were on social security and thus

disqualified, all of Bibb Transit Company's drivers and maintenance employees eventually became employees of the City of Macon. From then until now the city has refused[3] to recognize or bargain with the union.

On April 17, 1973, the legislature of this state created the Macon Transit Authority as a "public corporation of the State of Georgia . . . not an arm or agency of the City of Macon nor of Bibb County but . . . a body corporate and politic . . the powers granted [being] . . . *not restricted by limitations, constitutional or otherwise, upon the powers of the City of Macon* nor of Bibb County." 1973 Ga.Laws 2914, 2915. (emphasis added). The City of Macon has never activated or used the Macon Transit Authority as thus legislatively created. It is a dormant public corporation waiting for its first breath of life. In many respects it is similar to the Metropolitan Atlanta Rapid Transit Authority which has been activated and is now operating Atlanta's bus transportation system. 1965 Ga. Laws at 2243, *et seq.*

1. The National Labor Relations Act, 29 U.S.C. § 159, provides:

   "(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the *exclusive representatives of all the employees* in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ." (emphasis added). It is undisputed that the Amalgamated Transit Union was and for years had been duly certified as the "exclusive representative[s] of all the employees"—drivers and maintenance—of Bibb Transit Company. Under this section while there may not have been an existing, effective contract between Bibb Transit Company and its employees on February 28, 1973, the employees on that date were nevertheless still exclusively represented by the Amalgamated Transit Union "for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." The existence or non-existence of a contract has no effect—it neither increases nor decreases—these statutory rights and as such is immaterial to the issues before the court.

2. The court's September 5, 1973, opinion in *Joiner v. Thompson*, Civil Action No. 2882,

Macon Division, is the source of the circumstances surrounding the purchase.

3. The Mayor and Council of the City of Macon may legally refuse to recognize and bargain with unions to which its employees choose to belong, 29 U.S.C.A. § 203(d) and (e); *Beauboeuf v. Delgado College*, 428 F.2d 470 (5th Cir. 1970); *Firefighters Local 574 v. Floyd*, 225 Ga. 625, 170 S.E.2d 394 (1969), but may not in hiring, proscribing conduct of or firing its employees, infringe upon their First Amendment constitutional right to associate with others as a member of a labor union and to publicly and privately speak thereof. *Thomas v. Collins*, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430; *Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216; *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570; *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970); *Orr v. Thorpe*, 427 F.2d 1129 (5th Cir. 1970). On the other hand Georgia cities who choose to collectively bargain with unions, apparently may do so. See *Davis v. Howard*, 561 F.2d 565 (5th Cir. 1977), the subject of which is a contract between the City of Atlanta and the Laborers International Union of North America, AFL–CIO. For opinion appealed from, *see* 404 F.Supp. 678.

On August 23, 1974, the City of Macon applied for a federal grant of $1,020,852 under the congressionally enacted Urban Mass Transportation Act, 49 U.S.C.A. § 1601, *et seq.*, for the stated purpose of making capital improvements to its bus system. In January 1977 the city submitted a second application for a $132,409 operating assistance federal grant under said Act.

The Urban Mass Transportation Act authorizes the Secretary of Transportation to make grants or loans of tremendous sums from the federal treasury—at least TEN BILLION DOLLARS[4]—but specifies that "No financial assistance shall be provided . . . to any State or local public body or agency thereof for the purpose, directly or indirectly, of acquiring any interest in, or purchasing any facilities or other property of, a private mass transportation company, or *for the purpose of constructing, improving, or reconstructing any facilities or other property acquired (after July 9, 1964)* from any such company . . . unless (4) the Secretary of Labor certifies that such assistance complies with the requirements of section 1609(c) of this title." 49 U.S.C. § 1602(e). (emphasis added).

Title 49 U.S.C. § 1609(c) provides:

"(c) It shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. *Such protective arrangements shall include*, without being limited to, *such provisions* as may *be necessary for* (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) *the continuation of collective bargaining rights*; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining pro-

grams. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits "less than those established pursuant to section 5(2)(f) of this title. *The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.*" (emphasis added).

In response to the city's September 1974 application the Assistant Secretary of Labor wrote the city on December 18, 1974, and after stating the purpose of his letter and the provisions of law already recited, said:

"The Congress clearly indicated in the legislative history of the Urban Mass Transportation Act an intent through Section 13(c) to protect the rights, privileges and benefits of employees in the private sector who were assimilated into the public work force through Federally administered actions. The Congress also expressed its sense that the specific terms and conditions to be applied for the protection of employees in connection with a proposed grant of Federal financial assistance should, if possible, be the result of local bargaining and negotiations. Where mass transportation employees in the service area of a proposed project are represented for collective bargaining purposes, we look to the applicant and the union or unions representing those employees to reach agreement on fair and equitable employee protective terms and conditions upon which the Department of Labor can base its required certification. We stand ready and are frequently called upon to assist the parties in their efforts to reach an agreement. Should the parties, having made a good faith effort to reach an agreement, fail in that effort, the Secretary of Labor does have authority to determine the protective terms and conditions upon which he will base his certification.

In the Preapplication Program Narrative Statement, the City states that '[T]here is no recognized labor union acting as bar-

gaining representative for employees of the Macon Transit System.' I am aware, however, that up to the date in March of 1973 when the City began direct operation of transportation service through the Macon Transit System, the employees of the previous private operator, Bibb Transit Company, had been represented for collective bargaining purposes by the Amalgamated Transit Union. In fact, it was the inception of service by the City directly that resulted in the curtailment of the employees' collective bargaining rights.

In view of the circumstances in the Macon situation, I have determined that the Department of Labor should afford the Amalgamated Transit Union an opportunity to submit its views concerning the appropriate application of Section 13(c) to the City of Macon's proposed project. . . ."

The union's position was stated in its letter of January 22, 1975 to the Assistant Secretary as follows:

. . . . .

As you know, our Local Division 898 had long represented the employees of the Macon Transit System in their private employment status. Unfortunately, the City chose not to recognize the Union and to deprive these employees of their rights to collective bargaining and union representation upon the city's acquisition of the bus system on March 16, 1973. The foregoing is fully documented in an exchange of correspondence between the Union and the City, copies of which have previously been supplied to your office. There can be no doubt that the instant project involves the improvement of the formerly private transportation system within the meaning of § 3(e) of the Act. Accordingly, it is our position that specific protective arrangements must be inserted in the contract of assistance between the Federal Government and the City of Macon, which will effectively restore to the employees a continuation of their collective bargaining and representation rights which existed on the take-over date. Other mandatory provisions of a suitable employee protective arrangement would include terms and conditions to preserve the various employee rights, privileges and benefits, such as pension rights and benefits, as well as appropriate implementation of the statutory guarantees against worsening of employment position, offering benefits no less than those provided pursuant to § 5(2)(f) of the Interstate Commerce Act. In light of the City's continuing refusal to recognize the status of the Amalgamated Transit Union and its Local Division 898 as the duly designated representatives of the City's transit employees, it may be premature to specify the detail of an entire employee protective arrangement.

However, we would consider it appropriate for your office to call a meeting between the City and the representatives of the ATU for the purpose of establishing the validity of the ATU's continuing claim to represent these employees in their city employment under § 13(c) of the Act, and for the further purpose of bargaining between the ATU and the city representatives on an appropriate employee protective arrangement for this project, which would restore to these employees their full right to continued collective bargaining.

By letter to the Assistant Secretary dated February 3, 1975, the city disputed the Assistant Secretary's factual findings saying:

. . . . .

1. There was no collective bargaining relationship between a labor union and the employees of the Bibb Transit Company on March 15, 1973, when the City purchased certain equipment of the Bibb Transit Company.

The last collective bargaining contract between Bibb Transit Company and Division No. 898 of the Amalgamated Transit Union expired May 31, 1972. After the expiration of this contract and prior to the purchase of certain equipment by the City, Bibb Transit Company unilaterally eliminated many employee benefits, in-

cluding all holidays and vacations, substantially reduced the contribution to insurance programs and cut out the cost of living raises. (See the sworn statement of Emmett Barnes, III, Chief Executive Officer of the Bibb Transit Company, enclosed as Attachment A.)

and thereafter did not accept the Assistant Secretary's offer to call a meeting between representatives of the city and the union.

Having heard from both the city and the union by letter and personal visits the Assistant Secretary by letter of June 27, 1975, to the city, said:

. . . . .

I have carefully reviewed all of the material made available to us by the parties in connection with Macon's application. On the basis of the review, I find that a collective bargaining relationship did exist between the Bibb Transit Company and the Amalgamated Transit Union as representatives for the Company's employees at the time of the City's takeover. Accordingly, the correct interpretation and application of Section 13(c) of the Act in the instant case requires a protective arrangement which, in addition to satisfying the other requirements of that section, will permit a continuation of those collective bargaining rights.

It is clear from the record in this case that the employees of Bibb Transit Company did maintain a collective bargaining relationship up to the date of the City's assumption of operations. The *Affidavit of A. Emmett Barnes, III, President and Chief Executive of the Bibb Transit Company*, which was furnished to me with your February 3, 1975 letter, states that "During the period of time from May 31, 1972, to March 15, 1973, negotiations took place between the Company and the union." While I recognize that no document was executed to replace the collective bargaining agreement which may have expired on May 31, 1972, it is obvious that a collective bargaining relationship continued and that the employees did hold collective bargaining rights and exercised them, albeit with due regard to

the situation they found their employer to be in.

In its letter dated February 3, 1975, the City also stated that a "collective bargaining contract between the City and a labor union would violate State laws." The legislative history of the Urban Mass Transportation Act is very clear on this point—existing state or local laws do not create exceptions to the general requirement that assistance under the Act be conditioned on arrangements which, among other things, provide for the continuation of collective bargaining rights. Many other applicants for Federal assistance under the Act subject to similar impediments under local law have nevertheless qualified for assistance through some alternative which permitted compliance with the requirements of Section 13(c).

He further again suggested a meeting between the city and the union and offered to have it conducted under the department's auspices. The offer was not accepted.

On May 3, 1976, the city through Mayor Melton asked Secretary of Labor Usery because of the city's intention to submit another application for federal assistance, to review what would be required of the city. As a result an Assistant Secretary of Labor wrote Mayor Melton on August 11, 1976, as follows:

. . . . .

We have carefully reviewed our earlier determination and the information presented in your May 3, 1976 letter. On the basis of that review we can find no justification for modification to our interpretation of the Act as set forth in our June 27, 1975 letter.

We recognize your position that a collective bargaining arrangement would violate state law. However, we can only reemphasize that the legislative history of the Urban Mass Transportation Act is very clear in stating that existing state or local laws do not create exceptions to the general requirement that assistance under the Act be conditioned on arrangements which, among other things, provide

for the continuation of collective bargaining rights.

There are a number of alternative means the City of Macon could consider in order to comply with the statute. These include utilizing the so called "Memphis Formula" which involves contracting out the operation of the transit system to a management company. The management company could enter into collective bargaining agreements with the union and enable the employees to enjoy rights similar to those accorded to them when they were private employees. A second alternative would be to enact specific enabling legislation, establishing a transit authority (e. g., the Metropolitan Atlanta Transit Authority). A third alternative would involve the establishment of a public benefit corporation.

The Department of Labor remains available to provide any assistance we can to the City in its efforts to qualify for assistance under the Act.

Following submission of its 1977 grant application, Mayor Melton and City Attorney McKenna met with Mr. Molofsky of the Department of Labor, the president of the local union and union counsel on March 8, 1977 to discuss a proposed "Meet and Confer Ordinance." Neither the Secretary of Labor nor the union were convinced that such an ordinance, *if adopted by the city*, would guarantee the former employees of Bibb Transit Company, their collective bargaining rights in such a manner as to satisfy said section 13(c) of the Urban Mass Transportation Act, 49 U.S.C. § 1609(c).

The union set forth its position by letter of April 6, 1977:

Based upon our review of this Ordinance and the applicable law in the State of Georgia, we conclude that neither this Ordinance, as drafted, nor any revision thereof would satisfy the § 13(c) continued collective bargaining requirement as set forth in the Department of Labor's determination letter dated June 25, 1975, addressed to former Mayor Ronnie Thompson, as reaffirmed by Assistant Secretary DeLury's letter to you under date of August 11, 1976.

The Union has been forced to conclude, based upon a review of the applicable State law precedents, that no ordinance of the sort proposed by the city, or even as it might be redrafted to provide, in text, full collective bargaining rights, could satisfy the requirements of Georgia State law. See, *Chatham Assoc. v. Board of Public Education*, Case No. 28582, 3/7/74, 86 LRRM 2351; cf. *International Longshoremen's Assoc. v. Georgia Ports Authority*, 217 Ga. 712, 124 S.E.2d 733, cert. den. 370 U.S. 922 [82 S.Ct. 1561, 8 L.Ed.2d 503]; *Fire Fighters Local 574 v. Floyd*, 225 Ga. 625, 170 S.E.2d 394; *Tipton v. Spear [Speer]*, 211 Ga. 886, 89 S.E.2d 633; *Smith v. Ouzts*, 214 Ga. 144, 103 S.E.2d 567; *State Bd. of Education v. Elbert County Board*, 112 Ga.App. 840, 146 S.E.2d 344. For general discussion of this problem, see, also, Beaird, *Labor Relations Policy for Public Employees* : A Legal Perspective; 4 Ga.Law Review No. 1, Fall '69, pp. 110–133. Obviously, a local ordinance which fails to comply with governing state law is clearly invalid and offers no basis for compliance with the federal bargaining requirement.

In these circumstances, it would serve no useful purpose to discuss particular provisions of the Ordinance which we find contrary to applicable law, for independent reasons, or otherwise inadequate to restore to the members of our Local Union the full collective bargaining rights they enjoyed as employees of Bibb Transit Co. prior to its acquisition by the city and the transfer of our members to public employment. These collective bargaining rights included full union recognition, the right to bargaining over wages, hours, and working conditions, the right to arbitrate labor disputes, and the right to enter into enforceable collective bargaining and other agreements with the employer. In sum, we continue to believe that the city cannot successfully pursue the local ordinance approach but can and should adopt one of the three options which are presently available and which could assure compliance with § 13(c) collective bargaining requirements, namely,

(1) specific Transit Authority legislation (e. g. Atlanta and Savannah);

(2) Memphis Formula management company (private employer hired by the city to manage and operate the system, e. g. Jackson, Miss., Montgomery, Alabama); or

(3) public benefit corporation operation (e. g. Richmond, Lynchburg and Roanoke, Va., San Diego, Calif.).

\* \* \* \* \* \*

If, at any time, your position should change, I am sure you recognize that the Union would gladly cooperate and assist you in any way possible in meeting the federal requirement.

Neither the City of Macon, the Secretary of Labor nor the union deviated from their long-standing positions and opinions, and on September 1, 1977, the city filed its complaint in this court against the Secretary of Labor seeking an order of this court compelling the Secretary of Labor to certify compliance by the City of Macon with Section 13(c).

The parties stipulate that the court has jurisdiction. 28 U.S.C.A. § 1331(a) and § 1361.

An evidentiary hearing having been held on October 5, 1977, the parties having been heard from, and briefs having been submitted and considered, the case is ready for decision on the merits.

## THE TENTH AMENDMENT

The Tenth Amendment to the Constitution of the United States, the last of the "Bill of Rights", provides:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

In *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) the Supreme Court of the United States—after reminding of previously pronounced Tenth Amendment limitations on the power of Congress to legislatively impose requirements upon the States, to wit:

This court has never doubted that there are limits upon the power of Congress to override state sovereignty, even when exercising its otherwise plenary powers to tax or to regulate commerce which are conferred by Art. I of the Constitution. In *Wirtz*, for example, the Court took care to assure the appellants that it had "ample power to prevent . . . 'the utter destruction of the State as a sovereign political entity,' " which they feared. 392 U.S. 183 at 196, 88 S.Ct. 2017, 20 L.Ed.2d 1020. Appellee Secretary in this case, both in his brief and upon oral argument, has agreed that our federal system of government imposes definite limits upon the authority of Congress to regulate the activities of the States as States by means of the commerce power. See, e. g., Appellee's Brief, at 30–41; Tr of Oral Arg 39–43. In *Fry*, supra, the Court recognized that an express declaration of this limitation is found in the Tenth Amendment:

"While the Tenth Amendment has been characterized as a 'truism,' stating merely that 'all is retained which has not been surrendered,' *United States v. Darby*, 312 U.S. 100, 124, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430 (1941), it is not without significance. The Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system." 421 U.S. at 547 n. 7, 95 S.Ct. 1792, 44 L.Ed.2d 363.

\* \* \* \* \* \*

The expressions in these more recent cases trace back to earlier decisions of this Court recognizing the essential role of the States in our federal system of government. Chief Justice Chase, perhaps because of the particular time at which he occupied that office, had occasion more than once to speak for the Court on this point. In *Texas v. White*, 7 Wall. 700, 725, 19 L.Ed. 227 (1869), he declared that "[t]he Constitution, in all its provisions, looks to an indestructible Un-

ion, composed of indestructible States." In *Lane County v. Oregon*, 7 Wall. 71, 19 L.Ed. 101 (1869), his opinion for the Court said:

> "Both the States and the United States existed before the Constitution. The people, through that instrument, established a more perfect union by substituting a national government, acting, with ample power, directly upon the citizens, instead of the Confederate government, which acted with powers, greatly restricted, only upon the States. But in many articles of the Constitution the necessary existence of the States, and, within their proper spheres, the independent authority of the States, is distinctly recognized." Id., at 76, 19 L.Ed. 101.

In *Metcalf & Eddy v. Mitchell*, 269 U.S. 514, 46 S.Ct. 172, 70 L.Ed. 384 (1926), the Court likewise observed that "neither government may destroy the other nor curtail in any substantial manner the exercise of its powers." Id., at 523, 46 S.Ct. 172, 70 L.Ed. 384.

426 U.S. at 842, 96 S.Ct. at 2469, 49 L.Ed.2d at 252–53.

—held that Congress cannot require the States of these United States as employers to comply with the minimum wage laws of the United States because the minimum wage laws "operate to *directly displace* the States' freedom to structure integral operations in areas of traditional governmental functions . . . ." 426 U.S. at 852, 96 S.Ct. at 2474, 49 L.Ed.2d at 258. (emphasis added). The City of Macon first says that by conditioning grants of federal tax money upon the city affording collective bargaining rights to its employees, the federal government is indirectly requiring Macon to comply with federal labor law concepts and thus violating Georgia's and Macon's sovereignty in the same manner that Congress unconstitutionally attempted to amend the minimum wage laws to include states and their political subdivisions as employers.

Unlike the amendment to the minimum wage laws which included States and political subdivisions as employers under the minimum wage laws and thereby required States and political subdivisions to pay their employees a congressionally determined minimum wage and comply with the many other federal requirements, the Urban Mass Transportation Act does not directly require or command anything of States or their political subdivisions. Neither States nor political subdivisions are compelled to participate in the grand federal scheme created by the Act and thereby receive federal money. The participation is purely at their option. It is because of this that Macon is not now participating—it has elected not to.

■ While Congress cannot directly command or force a state or municipality to comply with federal wage and hour concepts, it may pursuant to the spending clause of the Constitution fix the terms and conditions upon which money from the United States Treasury will be allotted and disbursed to the States and their political subdivisions. See *Oklahoma v. United States Civil Service Commission*, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947), in which the Supreme Court approved a congressionally enacted law which required employees of States applying for and receiving federal highway funds, to comply with the Hatch Political Activity Act, a law of the United States, and further approved the removal by the Civil Service Commission of a member of Oklahoma's State Highway Commission from his office because of violation of the Hatch Act. Also see, *Florida v. Mathews*, 526 F.2d 319 (5th Cir. 1976) in which a regulation of the Secretary of Health, Education, and Welfare governing state programs for licensing administrators of nursing homes which participate in the federal medical assistance program (Medicaid) was found to be reasonably related to the purposes of the enabling legislation passed by Congress and to be non-offensive to the Tenth Amendment.

■ Paraphrasing *Florida v. Mathews* at 326, the only effect of this Urban Mass Transportation Act is to induce, but not require, the City of Macon to comply with the Urban Mass Transportation Act by doing whatever is necessary to afford its bus

drivers and maintenance employees collective bargaining rights in a manner determined by the Secretary of Labor; "this inducement does not infringe upon any power reserved to the state [of Georgia and its political subdivisions] under the Tenth Amendment . . . Once a state [or a municipality] chooses to participate in a federally funded program, it must comply with federal standards."

## ADMINISTRATIVE PROCEDURE ACT

The City of Macon secondly urges that the court pursuant to the Administrative Procedure Act review the failure of the Secretary of Labor to certify the City's compliance with § 13(c); his action the City says is an abuse of discretion.

The Administrative Procedure Act provides that:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof . . . The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States . . . ." 5 U.S.C. § 702.

The scope of review is set forth in 5 U.S.C. § 706 which provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) *hold unlawful and set aside agency action*, findings, and conclusions *found to be*—

(A) arbitrary, capricious, *an abuse of discretion*, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. (emphasis added).

This review procedure applies "*except* to the extent that—(1) statutes preclude judicial review; or (2) *agency action is committed to agency discretion by law.*" 5 U.S.C. § 701. (emphasis added).

In applying these statutes in another lawsuit in which the Secretary of Labor's certification pursuant to § 10(c) was being reviewed, the Third Circuit Court of Appeals described this scope of review as follows:

. . . [T]he scope of permissible review is limited. *A mere difference of judgment between a person disadvantageously affected by agency action and the responsible head of the agency* over the merits of particular administration action as a means of achieving a legislative objective, when Congress has assigned authority to make and act upon such determinations to the agency, *is not judicially reviewable. Panama Canal Co. v. Grace Line, Inc.,* 1958, 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788; *United States v. Carmack,* 1946, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209; *Adams v. Nagle,* 1938, 303 U.S. 532, 58 S.Ct. 687, 82 L.Ed. 999; *Williamsport Wire Rope Co. v. United States,* 1928, 277 U.S. 551, 48 S.Ct. 587, 72 L.Ed. 985. Moreover, section 10 of the Administrative Procedure Act expressly excludes "agency action * * * by law committed to agency discretion" from judicial review. Nothing in the Urban Mass Transportation Act suggests that the exclusionary language of section 10 is

inapplicable to the Secretary of Labor's required determination that protective arrangements adopted for the benefit of employees affected by a mass transportation project are "fair and equitable" and constitute "necessary" safeguards. To the contrary, *the statutory standard is expressed in such general concepts that it requires and must contemplate the exercise of discretion in choice* among various rational alternatives none of which can fully satisfy all demands of competing interests. Cf. *Duesing v. Udall*, 1965, 121 U.S.App.D.C. 370, 350 F.2d 748, cert. denied, 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667. Moreover, the absence of any provision in the Mass Transportation Act for judicial review of the Secretary's determination suggests that Congress recognized that the Secretary of Labor is at least as competent as a court to achieve such an accommodation of diverse and often conflicting social and economic interests as must be made in determining what employee protective arrangements incidental to mass transportation projects are "equitable" and "necessary". We are concerned here with a type of determination that "does not present questions of an essentially legal nature in the sense that legal education and lawyers' learning afford peculiar competence for their adjustment". Frankfurter, J., concurring in *Driscoll v. Edison Light & Power Co.*, 1939, 307 U.S. 104, 122, 52 S.Ct. 715, 724, 83 L.Ed. 1134. *Kendler v. Wirtz*, 388 F.2d 381, 383 (3rd Cir. 1968).

Thus, while this court has jurisdiction under 28 U.S.C. § 1331(a), plaintiff City of Macon's remedy in this court, *if there is a remedy*, is set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701 through 706; and that remedy does not apply—is not available to the City of Macon in this court—if this lawsuit involves "agency action . . . committed to agency discretion by law."

In *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the Supreme Court of the United States decided that § 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701–706, is not an independent grant to United States District Courts of subject-matter jurisdiction to review agency action. In doing so the Court pointed out that jurisdiction is conferred by 28 U.S.C. § 1331(a) which as amended on October 21, 1976, provides:

(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum of value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

The legislative history of that amendment, 1976 U.S.Code Cong. & Admin.News p. 6121, is a report of Congressional Committees entitled "JUDICIAL REVIEW—ADMINISTRATIVE AGENCY ACTIONS". Note in particular the following at p. 6129:

The committee does not believe that the partial elimination of sovereign immunity, as a barrier to nonstatutory review of Federal administrative action, will create undue interference with administrative action. Rather, it will be a safety-valve to ensure greater fairness and accountability in the administrative machinery of the Government.

Other methods found in the substantial and growing body of law governing availability, timing, and scope of judicial review provide a much more rational basis for controlling unnecessary judicial interference in administrative decisions than does the defense of sovereign immunity. *Thus, a case is unreviewable if it involves actions "committed to agency discretion by law."* Other defenses include (1) statutory preclusion; (2) lack of ripeness; (3) failure to exhaust administrative remedies; and (4) lack of standing. The availability of these defenses—all of which provide a sounder substantive basis to control court review on the merits than the confusing doctrine of sovereign immunity—indicates that *the policy against*

*indiscriminate judicial interference* with Government action would not be abandoned by eliminating the defense of sovereign immunity.

*Id.* at pp. 6129–30. This indicates that Congress recently was also of the opinion that the exceptions set forth in the Administrative Procedure Act are intended to preclude judicial review of—"indiscriminate judicial interference" with—actions "committed to agency discretion by law."

Does this controversy involve action committed to agency discretion by law?

The Urban Mass Transportation Act provides in 49 U.S.C.A. § 1609:

(c) It shall be a condition of any assistance under section 1602 of this title that *fair and equitable arrangements are made, as determined by the Secretary of Labor,* to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of this title. The contract for the granting of any such assistance *shall specify the terms and conditions* of the protective arrangements.

Nowhere in the Act is there a more definite or specific description of the employee protective arrangements. The Congressional command was and is "fair and equitable arrangements . . . as determined by the Secretary of Labor . . . ." That this contemplates an exercise of discretion [4] by the Secretary of Labor is shown not only by this clear, unambiguous provision leaving the Secretary to determine in his judgment what is fair and equitable but also by the legislative history of the Act.

Note first the following portions of the report of the majority of the Committee on Banking and Currency of the House, the committee of Congress that drafted the Act:

Protection of transit employees

The committee has given the most careful consideration to possible adverse effects of the bill on the interests of those engaged in transit employment. Labor organization representatives have expressed particular concern as to the possible effects of automation and the impact which public acquisition of existing private companies may have on the established status and bargaining rights of employees.

With respect to public ownership and operation, the committee believes that existing private companies will be acquired in only a few cases. It has been pointed out that existing private transportation companies are to participate in the assistance provided by this bill. *It is not the intent of this legislation to promote public ownership of urban transportation systems, or to eliminate or curtail collective bargaining rights.* The bill would help existing private companies to remain in business and to improve the transportation services they offer. If these aims are accomplished, the committee believes that those presently employed in existing private mass transit service will have much better chances

---

**4.** "When applied to public functionaries, discretion means a power or right conferred upon them by law of acting officially in certain circumstances, according to the dictates of their own judgment and conscience, uncontrolled by the judgment or conscience of others. . . ." *Black's Law Dictionary*, Rev. 4th ed. p. 553.

than at present for continued employment, thus protecting the rights and privileges which have been already established and preserving their status quo.

Although the problem of worker protection may arise in only a limited number of cases, the committee nevertheless believes that the overall impact of the bill should not be permitted to obscure the fact that in certain communities individual workers or groups of workers may be adversely affected as the result of the introduction of new equipment or the reorganization of existing transit operations. *The principle of protecting workers affected as a result of adjustments in an industry carried out under the aegis of Federal law is not new, particularly in the transportation industry.* Thus, railroad employees for years have enjoyed Federal protection against adverse effects attendant upon railroad consolidations. The problems of worker protection presented by the bill are not necessarily identical to those presented under other laws. *The committee believes, however, that workers for whom a standard of benefits has already been established under other laws should receive equally favorable treatment under the proposed new program. The committee also believes that all workers adversely affected by adjustments effected under the bill should be fully protected in a fair and equitable manner,* and that Federal funds should not be used in a manner that is directly or indirectly detrimental to legitimate interests and rights of such workers.

*The bill, accordingly, contains a specific provision* that, in communities where projects are to be assisted under the bill, *fair and equitable arrangements, as determined by the Administrator, must be made to protect the interests of affected transit employees.* In determining whether arrangements are fair and equitable within the meaning of this provision, the Administrator must act only after consultation with the Secretary of Labor and with his concurrence.

These fair and equitable arrangements for the protection of workers would include such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements; (2) the encouragement of the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) priority of employment or reemployment of employees terminated or laid off; and (5) said training or retraining programs. In addition, in the case of railroad employees for whom a standard of protection has already been established pursuant to section 5(2)(f) of the Interstate Commerce Act, arrangements under the bill would include provisions assuring them at least the same level of benefits where they are adversely affected with respect to their employment positions, as well as specific provisions insuring the preservation of their rights, privileges, and benefits under collective bargaining agreements.

The committee wishes to point out that, subject to the basic standards set forth in the bill, *specific conditions for worker protection will normally be the product of bargaining and negotiation.* The committee also expects that the Secretary of Labor, in addition to providing the Administrator with technical assistance, will assume responsibility for developing criteria as to the types of provisions that may be considered as necessary to insure that worker interests are adequately protected in the different types of situations that may arise.

1964 U.S.Code Cong. & Admin.News at pp. 2583–85.

Next note the expressed fears of the minority of the committee and their recognition that this bill left to the Secretary of Labor the very problem before the court:

## THE FEDERAL MAYOR OF MAIN STREET

Should Main Street U.S.A. seek to avail itself of the free Federal dollars which this bill would authorize, every one of these cities and hamlets would find it had acquired an additional mayor in the person of the Housing Administrator in Washington. It would then become clear the Federal mayor of Main Street, although not elected by vote of the local people, had acquired powers over their communities overriding those even of their own mayors and other duly elected local governing officials. It is hardly an accident that throughout the bill we repeatedly find vast grants of power, dressed up in plausible sounding language to be sure, but actually conditioned solely on what the Housing Administration "determines." We direct attention to specific provisions of the bill. *Id.* at 2593.

\*    \*    \*    \*    \*    \* ·

## "SLEEPER" LABOR PROBLEMS

There is an increasing awareness on the part of Members of Congress, labor, communities, and private companies that there are "sleeper" labor problems in this proposed legislation. Quite clearly a new area of major controversy has developed in this proposed legislation. Many are of the opinion the bill will favor municipal and public agency ownership and operation of mass transit facilities in a field which, as we have previously noted, private enterprise owned and operated approximately 95 percent of the companies in existence. Any large scale shift from private to municipal or public agency ownership and operation could have far reaching repercussions on labor. As was pointed out in the hearings by a labor representative, "On the other hand, you do have, as has been pointed out, certain States, certain municipalities, which not only deny the right to bargain, they also deny the right of workers to belong to a union." That brings us to the newly discovered dilemma in this bill. If it is amended to deny Federal assistance to localities because of State and local laws

restrictive of labor rights of municipal employees, then quite naturally those States and localities will vigorously resent the intrusion of the Federal Government into the field of States rights. On the other hand, if the bill is not so amended, labor quite properly would resent the use of Federal funds to curtail the rights of labor.

Since it is impossible to move in opposite directions at the same time, this posed a thorny problem for the committee. In our judgment the provision added by the committee and found in section 10(c) of the bill as reported, by no means solves the problem. It seems to us that even though the subsection carefully avoids use of the words "to the extent not inconsistent with State or local law" in enumerating the things the Housing Administrator is to do, nevertheless that is a limiting fact on what the Administrator can do. *In other words the problem is still there, and unresolved, although we must admit masked in a rather artful manner.*

The author of the labor amendment approved in the Senate bill, we think, put it quite accurately when he said:

It is impossible to satisfy all Senators, The reason why it is impossible to satisfy them all is that we cannot satisfy each instance and protect the Federal policy, *because some changes are going to have to be brought about in some of the States to conform to the Federal policy.*

We are of the opinion the Senate itself is not very satisfied that the labor section which was adopted met the problem, as otherwise there would have been no point in elsewhere amending the bill (as part of the labor amendment) to severely limit use of funds under the act to convert a privately owned and operated transit system to a publicly owned system. *In other words what really happened was that solution of the problem has been postponed* by not allowing the problem to come into existence in the first instance. If there is no shift from private to public ownership, there is no problem; therefore prohibit (except to a very limited degree) use of Federal funds to shift transit companies

from private to public ownership. *Id.* at pp. 2595–96.

■ All of this leads this court to conclude that § 13(c) of the Urban Mass Transportation Act, 49 U.S.C. § 1609(c), commits the agency action of determining the fair and equitable arrangements that will protect the interests of employees who have previously enjoyed collective bargaining rights, to the Secretary of Labor's discretion. This entire controversy surrounds the manner in which the Secretary is exercising that discretion. As such the action of the Secretary is "agency action . . . committed to agency discretion by law" and is not to be reviewed or "second guessed" by this court.

### MANDAMUS

The City of Macon also asserts that this court has jurisdiction under 28 U.S.C. § 1361, which provides:

> § 1361. Action to compel an officer of the United States to perform his duty
>
> The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

and pursuant to this grant of jurisdiction by Congress should mandamus [5]—command—the Secretary of Labor to certify compliance by the City of Macon with § 13(c) and thus make Macon eligible for grants of federal money.

The legislative history of section 1361 reveals that the statute's construction turns upon traditional mandamus law. As an extraordinary remedy, mandamus is reserved for extraordinary situations. *Will v. United States,* 389 U.S. 90, 107, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967) (common law writ of mandamus issued by court of appeals vacated); *Carter v. Seamans,* 411 F.2d 767, 773 (5th Cir. 1969), cert. denied, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970) (action in nature of mandamus under section 1361 dismissed). It lies only to compel the performance of a legal duty which is free of doubt. *State Highway Comm'n v. Volpe,* 479 F.2d 1099, 1104 n. 6 (8th Cir. 1973).

This court discussed the federal mandamus statute at some length in *Carter v. Seamans, supra.*

The courts that have construed Section 1361 have uniformly held that its sole function was merely to extend to all district courts the mandamus jurisdiction formerly exercised only by the District Court for the District of Columbia. The same authorities also emphasize that the provision in question did not make any substantive change in the law of mandamus.

\*　　\*　　\*　　\*　　\*　　\*

It is hornbook law that mandamus is an extraordinary remedy which should be utilized only in the clearest and most compelling of cases. Though it is a legal remedy, it is largely controlled by equitable principles and its issuance is a matter of judicial discretion. Generally speaking, before the writ of mandamus may properly issue three elements must coexist: (1) a clear right in the plaintiff to the relief sought; (2) a clear duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available.

411 F.2d at 773 (footnotes omitted).

*Winningham v. United States Dept. of Hous. & Urb. Dev.,* 512 F.2d 617, 620 (5th Cir. 1975).

■ Congress having clearly charged the Secretary of Labor with the responsibility of determining the "fair and equitable ar-

---

**5.** MANDAMUS. Lat. We command. This is the name of a writ (formerly a high prerogative writ) which issues from a court of superior jurisdiction, and is directed to a private or municipal corporation, or any of its officers, or to an executive administrative or judicial officer, or to an inferior court, commanding the performance of a particular act therein specified, and belonging to his or their public, official, or ministerial duty, or directing the restoration of the complainant to rights or privileges of which he has been illegally deprived. *Black's Law Dictionary,* Rev. 4th Ed., p. 1113.

rangements" to be made for the City of Macon bus drivers and maintenance employees to continue to enjoy the collective bargaining rights that they had while employed with Bibb Transit Company, there is obviously no clear right in the plaintiff City of Macon to an order of this court directing the Secretary to accept the City's view of what is "fair and equitable". There is likewise no clear duty on the Secretary's part to succumb to the suggestions or views of the City. Mandamus is also not a remedy available to the City of Macon.

There is no other basis for this court to order the Secretary of Labor to certify that the City of Macon has complied with Section 13(c) or may comply in a particular manner and thereby become entitled to certification and the key to the federal treasury.

Judgment shall be entered for the defendant.

SO ORDERED.