**Jimmy Allen ALEWINE et al., Plaintiffs,**

v.

**CITY COUNCIL OF AUGUSTA, GEORGIA, Defendant.**

**Civ. A. No. 179–113.**

United States District Court, S. D. Georgia, Augusta Division.

Jan. 13, 1981.

Charles L. Wilkinson, III, Augusta, Ga., for plaintiffs.

Samuel F. Maguire, Augusta, Ga., for defendant.

## MEMORANDUM OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

BOWEN, District Judge.

Plaintiff bus drivers, employees of the Transit Department of the City of Augusta,

Georgia, filed their complaint on the 31st day of May, 1979, seeking to recover compensation for back pay alleged to be due them as overtime pay claimed under the maximum hours provisions of the Fair Labor Standards Act (29 U.S.C. § 201 *et seq.*) and under a section of the Ordinances of the City of Augusta (Augusta City Code § 2–48). The complaint is cast in one count and seeks relief under federal and state (city ordinance) law. Plaintiffs seek injunctive relief, back pay, attorney's fees and liquidated damages under the provisions of 29 U.S.C. § 217.

During the course of the litigation, the plaintiffs applied to the Court for a preliminary injunction seeking to restrain the city's implementation of a plan to reduce their work hours. An order was entered, after hearing and consideration of said application, on June 20, 1980.

Findings of fact have been made and necessary inferences have been drawn. The Court proceeds to dispose of the case not on summary judgment, but after the evidence has case has been tried without a jury and the evidence reaches the Court from the testimony, the record, and the parties' stipulation.

This memorandum is cast in six parts. First, the Court determines its jurisdiction to proceed. Second, there is a statement of facts found by the Court upon the stipulations made by the parties. Third, there is a discussion and a statement of conclusions of law regarding the federal law claim of the plaintiffs. Fourth, there is a discussion and a statement of conclusions of law made regarding the pendent jurisdiction state law claim. Fifth, there is a discussion and a statement of findings with respect to the plaintiffs' recovery. Last, there is an order according some of the relief sought by the plaintiffs and the defendant.

Both the plaintiffs and the defendant have filed motions for summary judgment. This opinion and order disposes of the case on the merits. The Court has heard testimony and received evidence in the case on a prior application for preliminary injunction. The Court has considered the pleadings, the briefs, and the affidavits submitted by the parties. Most importantly, the Court has considered the detailed stipulation of facts which able counsel for the parties have presented. The case is not one of factual dispute. The lawyers have handled the case vigorously, but unemotionally. They have succeeded in an effort to present the facts of the case to the Court in a well organized, impartial, and meaningful way. In some litigation, there is great need for heated pursuit of minor factual matters. In this case, however, the parties, the public, the Court, and the interest of justice and proper advocacy have been best served by this simple, direct approach to the facts. Counsel are to be commended for their presentation in this regard. However, their agreement to the facts has never diminished the zeal with which counsel have approached the legal issues. The case has been aptly briefed and argued. It is thoroughly before the Court.

## JURISDICTION

There is no dispute between the parties as to the Court's jurisdiction in this case. With respect to the federal law cause of action, this Court has jurisdiction under the provisions of the Fair Labor Standards Act, 29 U.S.C. § 216(b) and under the provisions of 28 U.S.C. § 1331. Venue is proper in the Augusta Division of the Southern District of Georgia where the claim arose. 28 U.S.C. § 1391(a).

█ With respect to the state law claim made by the plaintiffs grounded in the city ordinances of Augusta, the facts which control are identical to those presented under the federal claim. The parties are the same and the interest of judicial economy is served by this Court's determination and disposition of that claim. The Court may therefore decide the state law claim under the doctrine of pendent jurisdiction. This doctrine provides that a federal court has the discretionary constitutional power to hear a state law claim if it arises out of the same nucleus of operative facts as plaintiffs' federal claim. *Tower v. Home Construction Co.*, 625 F.2d 1161 (5th Cir. 1980);

*Curtis v. Taylor,* 625 F.2d 645 (5th Cir. 1980); *United States v. Capeletti Brothers, Inc.,* 621 F.2d 1309 (5th Cir. 1980). Here, the federal and state law claims clearly arise out of the same nucleus of operative facts.

## THE FACTS

Plaintiffs are present or former employees of the City Council of Augusta, Georgia (hereinafter "the City"), who, at the time of the filing of the complaint, were working or who had worked within the preceding three years as bus drivers for the City Council of Augusta, Georgia. Plaintiff Francis H. Stafford was an employee in the housekeeping section of the Transportation Department. Her claim has been withdrawn by stipulation of counsel.

The City Council of Augusta is the governing body of the City of Augusta, Georgia, and is subject to the jurisdiction of this Court. The City of Augusta was chartered by the legislature and is a political subdivision of the State of Georgia.

The Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, *et seq.,* provides for minimum wages to be paid and limits the hours which can be worked by covered employees during a workweek. Section 207 provides for the maximum hours which certain employees can work during a workweek and provides for overtime pay above the maximum hours. Originally the provisions of the Fair Labor Standards Act exempted employees of street car, trolley, and motor bus carriers from the application of the minimum wage and maximum hours provision. The 1966 amendments to the Fair Labor Standards Act, Pub.L.No.89–601, extended the maximum hours coverage to non-operating employees of transit systems and extended minimum wage coverage to all transit employees.

Effective May 1, 1974, the maximum hours exemption for operating employees of transit systems contained in 29 U.S.C. § 213(b)(7) was repealed in two stages. On May 1, 1974, they were to be paid overtime compensation for hours worked in excess of forty-eight hours per week; beginning May 1, 1975, such employees were to be paid overtime compensation for hours worked in excess of forty-four hours per week; and beginning May 1, 1976, they were to be paid overtime compensation for hours worked in excess of forty hours per week; 29 U.S.C. § 207 requires employees to be paid time and one-half for all hours worked in excess of forty hours in any one workweek.

Section 2–48 of the Code of the City of Augusta, Georgia, 1972, as amended, pages 177–178, provides as follows:

The number of hours of work to be observed by any employee in any department of the City Council, except the departments under the control and jurisdiction of the Civil Service Commission of the City, and except all employees of the City Council engaged in the paving, macadamizing, or otherwise improving for travel the streets and alleys of the City, or in connection with the curbing and guttering of such streets and alleys, shall not exceed forty hours per work week. The term "work week" shall mean a calendar week. This section shall not be construed as a reduction of the salaries and wages of any of the present or future employees of the City Council.

It shall be lawful for any City official, the Mayor, the committee superintendent, foreman, or other person directing an employee to require an employee to proceed with any duties in excess of such forty hours per work week in case of an emergency and only in such event. However, when an emergency has ended, such time devoted by such employee in excess of a forty hour work week shall be allowed the employee as overtime with time and one-half pay.

The term "employees" as used in this section, shall mean the employees covered or hereafter covered by the Officers and Employees Tenure Act of 1937–38, as amended. Each of such employees employed by the day, now or in the future, shall be paid, when he has worked forty hours in any work week his daily wages for six days, whether such forty hours work is in six days or less. Each of such

employees working in any work week, now or in the future, less than forty hours, shall be paid on a time basis of the number of hours worked, as such time is in proportion to the time calculated for an employee who worked forty hours in the calendar week. (Code 1952, Ch. 2, Section 32)

On December 21, 1979, the Secretary of Labor published a regulation in the Federal Register, 44 Fed.Reg. 75630 (Dec. 21, 1979), declaring municipal transit bus systems to be within the "non-traditional" classification of municipal activities, within the meaning of *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

Prior to 1950, local bus service in Augusta was provided by the Georgia Power Company. In 1950, the Augusta Coach Company, a privately owned corporation, began operating local bus service in Augusta under a franchise from the City.

As shown by financial statements for the years 1968 through 1972, of record in this case, the Augusta Coach Company experienced a steady decrease in net income and working capital. The financial situation of the Augusta Coach Company steadily deteriorated until, in 1969, its Board of Directors notified the City of Augusta of their intention to discontinue service. The financial situation of the Augusta Coach Company continued to deteriorate, and early in 1973, the Augusta Coach Company again informed the City of Augusta of its intention to discontinue service.

The City Council of Augusta executed a six-month option to purchase assets of the Augusta Coach Company in April, 1973. For six months, the City Council provided operating assistance to the company while an application for federal assistance was processed.

The Augusta Coach Company made several attempts to remain profitable: it discontinued service to North Augusta, South Carolina, in 1964; it discontinued Sunday service and curtailed charter service in 1972; it deferred capital expenditures, such as the purchase of new buses; it deferred

pay raises to employees and it was allowed to operate without a franchise.

The average age of each bus in the fleet of buses owned by the Augusta Coach Company in 1973 was approximately 19 years. The buses generally were not mechanically reliable and often broke down in every day service. None of the buses were air conditioned.

The assets of the Augusta Coach Company were purchased with federal assistance by the City Council of Augusta by a "Letter of No Prejudice" dated November 7, 1973. The City Council of Augusta began operating the Augusta Transit Department on November 21, 1973. The City Council of Augusta made application to the Urban Mass Transportation Administration for capital assistance and operating grants. Said application was approved in January, 1975, and a grant contract was executed on January 30, 1975.

On January 10, 1975, the Urban Mass Transportation Administration offered the City a grant contract, which the City accepted on January 30, 1975; a copy of said Urban Mass Transportation Administration Capital Grant Contract between the City and the United States of America, Project Number GA–03–0004, the terms and conditions of that contract, a letter of certification from the Department of Labor to the Urban Mass Transportation Administration dated October 16, 1974, which is incorporated into said grant contract by reference, the Agreement between the City, the Municipal Employees Association, and the Amalgamated Transit Union, dated October 3, 1974, and incorporated into said grant contract by reference, are of record in this case.

In the Agreement between the City, the Municipal Employees Association, and the Amalgamated Transit Union, dated October 3, 1974, of record in this case, the City agreed that there would be no "worsening" of employees' position with respect to their employment. This agreement was required by the provisions of the Urban Mass Transportation Act of 1964, 49 U.S.C. §§ 1601, 1609(c).

Prior to the City's purchase of the assets and the rolling stock of the Augusta Coach Company, the City did not provide bus service.

The Augusta Transit Department of the City Council of Augusta provides fixed route, scheduled bus service and charter service. The bus service offered by the City Transit Department is similar to the service that was being provided by the Augusta Coach Company at the time of public takeover.

The quality of equipment has greatly improved. Had it not been for the grant from the Urban Mass Transportation Administration, the City would not have purchased the assets of the Augusta Coach Company. Were it not for the operating grants from the Urban Mass Transportation Administration, the City would not pay the cost of operating the local transit system.

After purchasing the assets of the Augusta Coach Company, the City hired the drivers and non-operating personnel employed by the company. The functions and duties of the newly hired personnel remained about the same as before.

The City charges bus riders a fee for regular bus service. Since acquisition by the City, the bus service has frequently contracted with private businesses and groups to provide private charter service.

Neither plaintiffs, nor other transit employees, are under the management of the Civil Service Commission (Police and Fire departments) of the City. In operating a bus service, the City engages in an activity previously engaged in by a private enterprise.

Since May 1, 1976, the City has paid overtime pay to the bus drivers only for hours they worked in excess of forty-eight hours a week; the City pays the mechanics in the Transit Department overtime after forty hours a week. Under this Court's order of June 20, 1980, the City has implemented a plan which reduced the bus drivers workweek to approximately 40 hours. Both the forty-eight hour workweek and the present week have been designed around the time required to make certain scheduled "runs" of bus service.

The State of Georgia does not require that by statute a municipal corporation provide bus service to its citizens.

The following chart shows the operating expense, revenue-fares, revenue-other and total revenue for the City Council of Augusta Transit Department for the years 1973 through 1978:

| YEAR | OPERATING EXPENSE | REVENUE–FARES | REVENUE–OTHER | TOTAL REVENUE |
|------|-------------------|---------------|---------------|---------------|
| 1973 | $226,482.83 | $110,392.71 | $ 55.10 | $110,447.81 |
| 1974 | 598,287.34 | 432,980.54 | 2,720.67 | 435,701.21 |
| 1975 | 669,807.93 | 440,638.58 | 1,252.78 | 441,891.36 |
| 1976 | 731,512.06 | 440,669.10 | 864.89 | 441,533.99 |
| 1977 | 858,846.61 | 421,925.77 | 675.11 | 442,600.88 |
| 1978 | 994,606.27 | 431,495.66 | 8,098.00 | 439,593.66 |

For the years 1973 through 1978, the following chart shows the Federal Government's participation in operating costs and net operating loss for the City Council of Augusta Transit Department:

| YEAR | FEDERAL GOVERNMENT PARTICIPATION | NET OPERATING LOSS |
|------|----------------------------------|--------------------|
| 1973 | $ --- | $116,035.02 |
| 1974 | --- | 162,586.13 |
| 1975 | --- | 257,916.57 |
| 1976 | 86,269.00 | 203,709.07 |
| 1977 | --- | 436,245.73 |
| 1978 | 347,839.00 | 207,173.61 |

The Federal Government's involvement, through the Urban Mass Transportation Administration, is extensive. The Federal Government absorbs 50% of the system's operating loss.

The capital outlays from the City's State Street Maintenance Account, Government (Federal) participation capital account and net capital cost for the Transit Department for the years 1973 through 1978 are as follows:

| YEAR | STATE STREET MAINTENANCE ACCT. | FEDERAL GOVERNMENT PARTICIPATION CAPITAL ACCT. | NET COST CAPITAL ACCT. |
|---|---|---|---|
| 1973 | $ --- | $ --- | $ --- |
| 1974 | 476,140.16 | --- | 476,140.16 |
| 1975 | 787,048.08 | 1,050,331.05 | 263,282.97 |
| 1976 | 76,304.32 | 980.20 | 53,938.52 |
| | | 21,385.60 | |
| 1977 | 566,021.66 | 407,547.20 | 153,764.14 |
| | | 4,710.32 | |
| 1978 | 605,162.40 | 491,726.46 | 113,435.94 |

For the years 1973 through 1978, the City Council of Augusta Transit Department had an annual ridership of approximately 1.9 million persons.

In fiscal year 1978, Transit Department operating expenses totaled $998,503, while the Department produced $432,418 in operating revenues from bus service. The deficit in fiscal year 1978 between operating expenses and operating revenues was paid by Federal funds in the amount of $283,042 from Federal funding sources, and $283,043 in City funds.

According to a recent survey conducted by the Augusta-Richmond County Planning Commission, 86% of the riders of the Augusta Transit Department belong to households without a car or with only one car.

Bus service in Columbia and Charleston, South Carolina, is provided by the South Carolina Electric and Gas Company. South Carolina Electric and Gas Company is a privately owned corporation.

The cities of Columbia and Charleston, South Carolina, are larger in population than is the City of Augusta. The counties of Richland and Charleston, South Carolina, in which are located the cities of Columbia and Charleston, respectively, are larger in population than is Richmond County, Georgia.

The public transit systems in the following major cities in Georgia are now owned and operated by local governments: Atlanta, Athens, Macon, Columbus, Savannah, Rome, Albany and Augusta.

In the following five stipulations, the term "Publically owned Transit Systems" refers to systems owned, operated or subsidized in major part by local, state or federal governments, and includes transit systems operated or managed by private firms under contract to governmental agency owners. According to the American Public Transit Association's *Transit Fact Book*, in 1978, in the United States,

(a) 90% of the total operating revenues generated by metropolitan transit systems were generated by publically owned transit systems,

(b) publically owned transit systems accounted for 89% of all vehicle miles operated in the transit industry,

(c) publically owned transit systems had 91% of all "linked passenger trips" in the transit industry,

(d) publically owned transit systems owned or leased 84% of the total motor buses owned or leased by the United States transit industry, and

(e) publically owned transit systems accounted for 48% of all transit systems nationwide.

A copy of the 1979 American Public Transit Association's *Transit Fact Book* is of record in this case.

## FEDERAL LAW CLAIMS

The plaintiffs' complaint as it relates to claims under federal laws involves both the

Fair Labor Standards Act (29 U.S.C. § 201 et seq.) and the Urban Mass Transit Act (49 U.S.C. § 1609(c)). This Court is guided by a number of recent federal appellate decisions with respect to the interpretation of these statutes.

Over 40 years ago, the Congress of the United States enacted the Fair Labor Standards Act. The Act required covered employers to pay their employees minimum wages plus overtime pay at increased rates for time in excess of a maximum-hour workweek. The Supreme Court of the United States unanimously upheld the Fair Labor Standards Act as a valid exercise of congressional authority under the Commerce Clause of the Constitution in *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), observing: "whatever their motive and purpose, regulations of commerce which do not infringe some constitutional prohibition are within the plenary power conferred on Congress by the Commerce Clause." *Id.* at 115, 61 S.Ct. at 457.

The original Fair Labor Standards Act passed in 1938 specifically excluded from coverage the states and their political subdivisions. However, in a series of amendments beginning in 1961, Congress began to extend the coverage provisions of the Act to some types of public employees. This series of amendments culminated in the 1974 amendments which are the most recent in the series of broadening amendments to the Fair Labor Standards Act. By the 1974 amendments, Congress has extended the minimum wage and maximum hour provisions to almost all public employees employed by the states and their political subdivisions. The constitutionality of this vast extension of the coverage of the Act under the 1974 amendments was tested in the case of *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed. 245 (1976), in which the Supreme Court provided to the lower courts some guidance and few specifics as to the unconstitutionality of the coverage broadening 1974 amendments to the Fair Labor Standards Act.[1]

Briefly, the Court reasoned that while Congress may have plenary power under the Commerce Clause[2] to regulate commerce, and that the Fair Labor Standards Act was a legitimate exercise of this authority, it may not effect legislation which attacks the integrity or the very sovereignty of the states as states. Recognizing that independent sovereign states are necessary to the maintenance of the union in a federal system envisioned by the Constitution, the Court determines that even the plenary grant of authority to legislate contained in the Commerce Clause must yield to the right of the states to structure their own agreements with employees engaged in integral government functions. The Court gave examples of integral government functions such as fire prevention, police protection, sanitation, public health, and parks and recreation, and noted that "these examples are obviously not an exhaustive catalog of the numerous line and support activities which are well within the area of traditional operations of state and local governments." 426 U.S. at 851 n. 16, 96 S.Ct. at 2474. The Court ultimately con-

1. Incidentally, the 1974 amendments also eliminated the exemption from coverage under the Act for operator employees of motor bus and trolley carriers.

 As stated earlier, the FLSA 29 U.S.C. § 213(b)(7) excludes bus drivers from coverage. By the 1974 amendments to the Act, the exemption clause was repealed, effective May 1, 1976. It should be noted that the plaintiffs would be entitled to a forty hour workweek if they were employed in private industry. The Court views this only incidentally, and has concluded elsewhere that this fact does not amount to a "worsening" of conditions of employment.

 This case deals with the status of the plaintiffs as employees of a political subdivision of the State of Georgia, and not as employees of a private motor bus or trolley carrier. The elimination of that coverage exemption is of interest, but of importance only in considering the plaintiffs' contention with respect to the Urban Mass Transit Act and the "worsening" of their employment conditions.

2. Article I, Section 8, Clause 3 of the United States Constitution grants to the Congress the power "... to regulate commerce with foreign nations, and among the several states, and with the Indian tribes ...."

cluded: "we hold that insofar as the challenged amendments operate to directly displace the states' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Article I, Section 8, Clause 3." *Id.* at 852, 96 S.Ct. at 2474.

Further, the Supreme Court specifically overruled its decision in *Maryland v. Wirtz*, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968) and recognized that although ". . . there are obvious differences between the schools and hospitals involved in *Wirtz*, and the fire and police departments affected here, each provides an integral portion of those governmental services which the states and their political subdivisions have traditionally afforded their citizens." *National League of Cities v. Usery*, 426 U.S. at page 855, 96 S.Ct. at page 2476. Thus, the Supreme Court has added schools and hospitals to the examples of other traditional operations of state and local governments.

Quite simply put, the main issue before this Court on the plaintiffs' federal law claim is whether the operation of an urban transit department by the City of Augusta (a political subdivision of the State of Georgia) is an integral operation in an area of traditional governmental function. If so, the Fair Labor Standards Act provisions cannot apply to this case to reduce the workweek of the drivers to 40 hours. If not, the Transit Department and all of its employees are subject to all provisions of the Act.

■ In *National League of Cities*, the Supreme Court did not provide specific definitions of the words "integral" and "traditional" as they are used therein. While this may be regretable for city and state administrators in attempting to ensure that the activities of their operations comply with the Constitution and the acts of Congress,

the resulting flexibility afforded to courts in molding relief under the opinion, according to the facts of the cases arising, may be beneficial. A determination of whether an activity or operation of a state or a city is integral and one of traditional governmental function involves an interpretation of those terms and their construction in light of the facts. Thus, a conclusion thereon is mixed of law and fact.

■ Several courts have interpreted the *National League of Cities* decision. The esteemed Second Circuit Court of Appeals commented at length on *National League of Cities* in *United Transportation Union v. Long Island Railroad Company*, 634 F.2d 19 (1980). In that case, the Second Circuit noted the absence of a precise definition of the key words but found solace in the fact that the Court had given several examples of integral operations of traditional governmental functions. In holding that the Long Island Railroad Company was not subject to federal regulation, the court observed that a traditional governmental function need not be one always provided by government. I interpret their holding to mean that integral operations of governmental functions may become traditional, or less so, depending on the change of times and the needs of a developing society.

In *Amersbach v. City of Cleveland*, 598 F.2d 1033 (6th Cir. 1979), the Sixth Circuit Court of Appeals determined that Cleveland's operation of a municipal airport amounted to an integral traditional government function within the ambit of *National League of Cities*. The *Amersbach* court suggested a four-prong test [3] noting certain elements common to each of the examples given by the Supreme Court. However, I do not conclude that the application of the *Amersbach* test in strict form should be dispositive of this case.

---

**3.** The *Amersbach* court noted:

(1) the government service or activity benefits the community as a whole and is available to the public at little or no direct expense;
(2) the service or activity is undertaken for the purpose of public service rather than for pecuniary gain;

(3) government is the principal provider of the service or activity; and
(4) government is particularly suited to provide the service of a communitywide need for the service or activity.

The first element of the *Amersbach* test requires a finding that the service is available to the public at "*little or no direct expense.*" This element of the test seems to be contrary to its application to at least one of the examples mentioned by the Supreme Court. Hospital services are seldom, if ever, available to the general public at little or no direct expense. If the *Amersbach* test were applied strictly in this case, it would fail upon the finding that the riding public pays approximately one-half of the expense of the transit operations of the City of Augusta. While the payments by the riders are small, they are direct, and they are not so insignificant as to amount to "little or no direct expense". I do not consider the *Amersbach* test to be conclusive in this case, nor that it should be strictly applied in any case. Obviously, it was correct for application to the municipal airport of Cleveland, but it need not be strictly applied here.

■ While the Supreme Court has provided no definition of "integral" or "traditional" and while the *Amersbach* and *Long Island Railroad* decisions are not directly on point with the operation of a city transit department, a decision must be made. The foremost exponent of "tradition" known to this Court is Tevye.[4] Even that source has been studiously researched along with several *Websters*. In my opinion, none of these sources envision "tradition" or "traditional" in quite the way that the Supreme Court did in *National League of Cities*. Thus, I cannot conclude that traditional government functions must be those which are time honored, hoary, or historic. Integral operations of traditional government functions may be those which the public has come to expect and demand in light of the change of times and needs of society. Here, the city's operation of the transit department benefits the community as a whole, is available to the public at small cost, is undertaken for the purpose of public service rather than pecuniary gain, and government is the principal provider of the service and is particularly suited to provide the service. There is an obvious community wide need for the service. Accordingly, within the view of the *National League of Cities* case as I interpret the terms from the usage of the Supreme Court, the operation of the City Transit Department of Augusta is an integral operation of traditional governmental function.

Because of the application of equitable principles elsewhere in this memorandum, it should be noted that this case is not an easy one. It presents a very complex question to the district court. The conclusions are not facile, nor is there a wealth of authority to guide the Court's decision. Skilled lawyers have legitimately different opinions derived after hours of careful research. It is difficult to imagine that city or state administrators, even those skilled in the law, could make a meaningful, correct determination as to whether their operations are covered by the Fair Labor Standards Act without litigation. This is due not to the fact that the Supreme Court has employed euphemism in its opinion, but to the flexibility of its decision which must be judicially applied to fit the circumstances of a given case. In short, it is unreasonable to demand perfection of those charged with a decision when the choices are as vague and obscure as presented here.

■ With the resolution of the integral operation of traditional governmental func-

---

4. Tevye, of course, is the main character in the musical play *Fiddler on the Roof* by Joseph Stein, Jerry Bock and Sheldon Harnick. In the prologue, Tevye, the religious but poor dairyman, defines "tradition" at least as well as the Supreme Court has done: "And how do we keep our balance? That I can tell you in a word—tradition! Because of our traditions, we've kept our balance for many, many years. Here in Anatevka we have traditions for everything—how to eat, how to sleep, how to wear clothes. For instance, we always keep our heads covered and always wear a little prayer shawl. This shows our constant devotion to God. You may ask, how did this tradition start? I'll tell you—I don't know! But it's a tradition. Because of our traditions, everyone knows who he is and what God expects him to do."

 (Enter the villagers, singing)
 "Tradition, tradition—tradition.
 Tradition, tradition—tradition."

tion question, other issues involving the application of federal law and principles arise. The Court concludes that the defendant has not waived any immunity, or contracted away its right to challenge the constitutionality of the Fair Labor Standards Act by accepting grants from the Urban Mass Transit Administration.

The *National League of Cities* opinion does not suggest that federal financial involvement or support to any state activity has bearing upon the right of a state or political subdivision to challenge an unconstitutional act of Congress. After *National League of Cities*, it is clear that fire prevention, police protection, sanitation, public health, parks and recreation, and school and hospital operations are not subject to the application of the Fair Labor Standards Act. It is a truism to state that federal involvement by financial assistance in the aforementioned "traditional" governmental functions is massive. For example, the federal government assists local government with traditional governmental functions by financial aid as follows:

Police: Omnibus Crime and Safe Streets Act of 1968, 42 U.S.C. § 3701, *et seq.*

Fire: Federal Fire Prevention and Control Act of 1974, 15 U.S.C. § 2201, *et seq.*

Education: Elementary and Secondary Education Act of 1965, 20 U.S.C. § 2701, *et seq.*

Public Health/Hospitals: Public Health Service Act, 42 U.S.C. § 201, *et seq.*

Parks and Recreation: Housing and Community Development Act of 1974, 42 U.S.C. § 5301, *et seq.*

Sanitation: Safe Drinking Water Act, 42 U.S.C. § 300f, *et seq.*; Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.*

Also, there is the generalized federal aid program to state and cities known as "revenue sharing".

All of the aforementioned federal assistance to local government programs were created by statutes in effect on the date of the *National League of Cities* opinion. It would be illogical to conclude that the mere acceptance of federal aid could be the basis of a waiver of immunity or the right to challenge the unconstitutionality of an act of Congress.

More specifically, however, the City of Augusta has accepted federal money from the Urban Mass Transit Administration. In order to obtain the federal aid, the City has applied for grants and has signed agreements under section 13(c) of the Urban Mass Transit Act, 49 U.S.C. § 1609.[5]

The city of Augusta has executed an agreement with the Urban Mass Transit Administration under section 13(c) of the Urban Mass Transit Act. This is commonly known as a 13(c) agreement. The plaintiffs have argued that the 13(c) agreement requires the payment of overtime compensation under the Fair Labor Standards Act. The plaintiffs reason that the failure to require such payment amounts to "a worsening" of their conditions of employment. There is little authority on this point. Here, the employees now enjoy far greater job security. Also, they have received several pay raises. They are City employees and have tenure under the City ordinances. When the City took over the transit operation, the drivers workweek remained the

---

5. 49 U.S.C. § 1609 provides in pertinent part: "It shall be a condition of any assistance under section 3 of this Act . . . to protect the interests of employees affected. . . . Such protective arrangements shall include, without being limited to, such provisions as may be necessary for . . . the protection of individual employees against a worsening of their positions with respect to their employment.

While Congress could have chosen between such words as "deterioration", "diminution" and others, it chose to use the curious term "worsening". It appears, through lack of any

other precise definition of the term, that "worsening" presumes that things were already bad before they worsened. Apparently, the Urban Mass Transit Act proscribes any act which makes employment conditions worse than they were. Worse is a comparative term. As compared to some other convoluted language we observe in federal statutes, the tortured genesis of "worsening" as a noun is not the worst ever. To adopt the congressional idiom, it should not be referred to as "better" than some; perhaps it is simply less worse.

same, 48 hours. It is true that had the Augusta Coach Company remained in business, the workweek of the drivers would have been reduced by the Fair Labor Standards Act to 40 hours in 1976. However, this is speculation in which the Court shall not engage.

It is clear that the conditions of employment for the plaintiff bus drivers are now equal to or better than those which existed when they worked for the Augusta Coach Company. Whether conditions of employment for employees protected by a 13(c) agreement have undergone "a worsening" is one of reasonable comparison.

In realistic terms, it appears that the working conditions of the bus drivers employed by the City of Augusta are better than those which existed during their employment by the Augusta Coach Company. Certainly, it would be error to conclude that the conditions of employment of the bus drivers of the City of Augusta had, in fact, deteriorated since their employment by the City.

## STATE LAW CLAIM

■ Plaintiffs' complaint alleges a cause of action against the defendant City under state law. The Court has already determined its jurisdiction with respect to the state law claim. A claim alleging the violation of a right created by city ordinance is cognizable as a cause of action under state law. *City Council of Augusta v. Kelly*, 53 Ga.App. 589, 186 S.E. 222 (1936).

■ Here, the plaintiffs as city employees are entitled to benefit from the rights created by an old ordinance of the City of Augusta, which, in general terms, establishes the same maximum hour limitations as plaintiffs have sought to impose in this case under the Fair Labor Standards Act. The ordinance is direct and specific, and its language is unambiguous. The ordinance, which is quoted in the "facts" portion of this memorandum, covers all city employees who are not specifically exempted by its terms.

The defendants have argued that the plaintiffs are exempt from the provisions of the overtime ordinance because it has been utilized in the past only to award compensatory time to overtime employees, and because the plaintiff bus drivers "are engaged in the paving ... or otherwise improving for travel the streets and alleys of the city" because the performance of their duties relieves traffic congestion and reduces air pollution.

Whether or not the ordinance has been used to pay overtime rates or to award compensatory time to other employees in other departments of the city is irrelevant to this dispute. Compensatory time allocations have not been used in the Transit Department nor has the allocation of such time become a part of any tacit or express agreement between the City and the bus drivers. The bus drivers have been regularly paid overtime in excess of the forty-eight hour week which was adopted upon the City's takeover of the Augusta Coach Company. The language of the ordinance is clear. It provides for payment of overtime wages at the rate of 1 and ½ times the regular rate. Thus, the "comp time" argument urged by the defendant is to no avail.

■ The argument that the bus drivers are exempt from the overtime pay provisions of the ordinance because of the fact that their services reduce traffic congestion and air pollution thus "improving for travel the streets and alleys of the City of Augusta" is disingenuous at best. Such an interpretation of the clear language of the ordinance requires elasticity of logic and agility of linguistic ability this Court does not possess. The bus drivers do not fall within the categories of exempted city employees.

■ The essence of the case with respect to the state law claim is that some recovery is required. The quoted ordinance is the duly enacted law within the sphere of operations of the City of Augusta. City employees are entitled to its observance, no more nor any less. While there may have been active or acquiescent nonobservance of the ordinance from time to time, by particular City departments, the ordinance is law

and remains so. There can be no tacit repeal of the ordinance by actions of the Mayor, the transit committee of council, or council members acting individually. The repeal of the city ordinance and the rights which it confers upon city employees could only be accomplished by the duly elected mayor and council of the City of Augusta acting in accord with the terms of the city charter. No such repealer has been enacted.

The Supreme Court of Georgia spoke authoritatively to this proposition in 1894 in *Harper v. Mayor of Jonesboro*, 94 Ga. 801, 22 S.E. 139 (1894). "The passage of an ordinance is a legislative act, accompanied with a certain degree of formality, and, . . . no change can be made in such an ordinance except by the passage of another, qualifying, repealing, or modifying its terms." *Id.* at 803, 22 S.E. 139.

Until some act of equal dignity to the enactment of the quoted ordinance takes place, the ordinance remains in full force and effect. The ordinance may not be repealed, modified, altered, amended, or changed in any way by acquiescense of the mayor and council members or by agreement between the city employees individually with the mayor and members of council, or other city employees.

Thus, it seems that the bus drivers, as city employees, are entitled to a 40-hour workweek and are entitled to receive the rate of 1 and ½ times their regular wage for hours worked in excess of 40 hours per week. With respect to the city ordinance,

this conclusion is inescapable. The only time to be included under the ordinance dictated forty-hour workweek is that spent on regular, scheduled runs or required charter trips. The workweek calculation should exclude time spent on charter trips for which drivers volunteer.[6] The ordinance does not speak to this point, but this is the only reasonable interpretation.

## PLAINTIFFS' RECOVERY

The Court has determined that the plaintiff bus drivers are entitled to recover from the defendant upon their state law claim. No recovery is permitted with respect to their federal law claim. The next question then is as to the amount which each employee should recover.

For this state law claim, there is no statutory provision providing for liquidated damages similar to those which are afforded in certain circumstances under the Fair Labor Standards Act, 29 U.S.C. § 217. Under Georgia law, the award of attorney's fees to a prevailing party is permitted only under carefully defined circumstances. Similarly, punitive damages, liquidated damages, or other types of penalties are permitted only when authorized by statute. Here, the right to recover, or cause of action, is created by city ordinance and there is no statutory provision authorizing the collection of attorney's fees, punitive damages, liquidated damages or penalty by the successful plaintiff.[7] Accordingly, no damages in addition to the back pay amounts due the plaintiffs can be recovered by them or on their behalf.

---

**6.** The Fair Labor Standards Act specifically excludes charter trip time. The pertinent language of 29 U.S.C. § 207(n) is "In the case of an employee of an employer engaged in the business of operating a street, suburban or interurban electric railway, or local trolley or motorbus carrier (regardless of whether or not such railway or carrier is public or private or operated for profit or not for profit), in determining the hours of employment of such an employee to which the rate prescribed by subsection (a) applies there shall be excluded the hours such employee was employed in charter activities by such employer if (1) the employee's employment in such activities was pursuant to an agreement or understanding with his employer arrived at before engaging in such employment,

and (2) if employment in such activities is not part of such employee's regular employment."

**7.** Under Ga.Code § 20–1404, the expenses of litigation are not generally allowed as a part of the damages unless the defendant has acted in bad faith or has been stubbornly litigious. There is no evidence here of bad faith on the part of the defendant. Ga.Code § 20–506 allows attorney's fees in cases involving written evidence of indebtedness, and as such, is not applicable here. Ga.Code § 20–1405 prohibits the award of exemplary damages in contract cases. Otherwise, punitive damages are available in tort actions only under §§ 105–2002 and 105–2003.

During the course of this litigation, counsel for both parties have exhibited admirable zeal in the representation of their clients and in their responsibilities to the Court and the public in general. Counsel have made stipulations which have established most of the facts found by the Court. Additionally, counsel have stipulated the back pay amounts which would be due to the individual party plaintiffs in the event of their recovery. This stipulation of amounts with respect to each employee has been filed with the Court and made a part of the record in this case. The parties, thereby, have relieved the Court of the laborious task of calculating damages in the case of each of the individual plaintiffs. Counsel are to be commended for this endeavor.

 The city ordinance is glaringly explicit. However, the city administration has historically used this ordinance to allocate compensatory time to its employees. The city has always maintained a forty-eight hour workweek for its bus driver employees prior to the inception of this litigation. This practice was held over from the prior operation of the Augusta Coach Company. The city bus drivers have received several raises since the Transit Department was organized and the city began its transit operations. The working conditions of the drivers has not undergone "a worsening" as that term is contemplated in the Urban Mass Transit Act. For years, the drivers were apparently content with their agreement and the practice of the forty-eight hour workweek. There is no evidence that the city administration has willfully or intentionally deprived its bus driver employees of any right created by ordinance. Instead, the failure to accord its bus drivers employees with the same maximum hours enjoyed by other city employees seems to be the result of inadvertence, misdirected attention to similar provisions of the Fair Labor Standards Act, and the urgent needs of the Transit Department.

While the employees' agreement to the forty-eight hour workweek cannot be construed to abrogate the city ordinance requirement of a forty-hour workweek, the special factual situation that this case presents should be thoroughly considered. Here, the City took over a business operation, not formerly subject to the overtime provisions of the Fair Labor Standards Act, where the ordinary workweek was 48 hours. This forty-eight hour workweek was not designed to be oppressive or exploitive. It was designed around the drivers' average daily run. Moreover, it should be remembered that the plaintiffs, after the inception of this litigation, strenuously protested the reduction of their forty-eight hour workweek by the City. They cited extreme financial hardship as the only possible result from the City's action. Also, the drivers actively seek charter runs in addition to their regular scheduled runs. The Court has already observed that it would be difficult and improbable, if not impossible, for City administrators of ordinary skill and experience to apply with certainty the provisions of the Fair Labor Standards Act in light of the *National League of Cities* opinion. It is easy to see how the attention and concern of City administrators and council members could have been quite honestly misdirected to the question of coverage under the Fair Labor Standards Act and the imagined impact that would have. Apparently, that concern and attention has been to the exclusion of thorough consideration of the City ordinances themselves.

This is a case for the application for equitable principles. The background of the city's entry into the transit operations, the delay in bringing the question to the forefront of the city's consideration, the good faith of all the parties, and the fact that the arrangement between the city and the employees had worked smoothly for a considerable period of time, and other special facts observed by the Court make it unconscionable to award to the plaintiffs the total amount which they seek to recover in this case. Here the Court sits as trier of fact as well as the judge of the law. Under the state law claim, a jury could return a general verdict. This Court has determined the facts under the parties' factual stipulation and the judgment to be entered by the

Court must be responsive both to the law and all of the facts of the case. Accordingly, the award to the bus driver plaintiffs under their state law claim shall be in an amount equal to 66⅔% of the maximum recovery which has been stipulated by the parties.