Jimmy Allen ALEWINE, et al.,
Plaintiffs-Appellants,

v.

CITY COUNCIL OF AUGUSTA,
GEORGIA, Defendant-Appellee.

C.D. JOINER, on behalf of himself and others similarly situated,
Plaintiffs-Appellees,

v.

CITY OF MACON, Defendant-Appellant.

Nos. 81–7490, 81–7789.

United States Court of Appeals,
Eleventh Circuit.

March 7, 1983.

Rehearing and Rehearing En Banc
Denied May 19, 1983.

Charles L. Wilkinson, III, Augusta, Ga., for plaintiffs-appellants in No. 81–7490.

Stephen E. Shepard, Samuel F. Maguire, Stanley G. Jackson, Harris, McCracken & Jackson, N. Kenneth Daniel, Augusta, Ga., William T. Coleman, Jr., Washington, D.C., for City of Augusta.

O'Melveny & Myers, William T. Coleman, Jr., Washington, D.C., amicus curiae for American Public Transit Ass'n.

Jones, Cork, Miller & Benton, W. Warren Plowden, Jr., Macon, Ga., William T. Coleman, Jr., Washington, D.C., for defendant-appellant in No. 81–7789.

Mincey & Kenmore, David L. Mincey, Macon, Ga., Jacobs, Burns, Sugarman & Orlove, Linda Hirshman, Chicago, Ill., for plaintiffs-appellees in No. 81–7789.

Joseph M. Woodward, Beate Bloch, U.S. Dept. of Labor, Washington, D.C., for intervenor United States.

Before TJOFLAT and HATCHETT, Circuit Judges, and MORGAN, Senior Circuit Judge.

HATCHETT, Circuit Judge:

These cases, consolidated on appeal, require that we decide whether a municipality's operation of an urban mass transit system constitutes a traditional governmental function. If so, the tenth amendment limitation upon congressional exercise of the commerce power bars application of the overtime compensation provisions of the Fair Labor Standards Act (FLSA), 29 U.S. C.A. § 207 (Supp.1982), to those public employees engaged in urban mass transit service. If not, the overtime compensation provisions of the FLSA are applicable and require the municipality to pay mass transit employees time and one-half for all hours worked in excess of forty per work week. We hold that publicly-owned mass transit is not a traditional governmental function in these cases.

## I. BACKGROUND

### A. *Proceedings Below*

Jimmy Allen Alewine and a class of bus drivers of the Augusta Transit Department brought suit against the City Council of Augusta (Augusta) seeking to recover overtime pay under the FLSA, 29 U.S.C.A. § 207 (Supp.1982), and under a similar provision of the Augusta City Code, § 2–48.[1]

---

1. Section 2–48 of the Code of the City of Augusta, 1972, as amended, provides in pertinent part:

    The number of hours of work to be observed by any employee in any department of the City Council ... except all employees of the City Council engaged in the paving, macadamizing, or otherwise improving for travel the streets and alleys of the City, or in connection with the curbing and guttering of such streets and alleys, shall not exceed forty hours per work week.

    [S]uch time devoted by such employee in excess of a forty hour work week shall be

allowed the employee as overtime with time and one-half pay.

The City of Augusta argued in the district court that the plaintiff bus drivers were exempt from the overtime provisions of the ordinance because the bus drivers "are engaged in the paving ... or otherwise improving for travel the streets and alleys of the City" in that their duties relieve traffic congestion and reduce pollution. Rejecting this argument, the district court noted that "[s]uch an interpretation of the clear language of the ordinance requires elasticity of logic and agility of linguistic ability this Court does not possess." 505 F.Supp. at 891. Providently, the City of Augusta has re-

The complaint alleged that Augusta's operation of a bus service was not a traditional governmental function; and therefore, the plaintiff drivers were entitled to overtime pay for all hours worked in excess of forty per week beginning May 1, 1976. The City of Augusta acknowledged that the FLSA on its face applied and required payment of overtime after forty hours, but contended that application of the FLSA was unconstitutional in light of the Supreme Court's invalidation of the overtime provisions as applied to certain state and local governmental employees in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

The district court held that the municipal bus system in Augusta is an integral operation of a traditional governmental function and therefore the FLSA's overtime provisions may not constitutionally apply to the system's employees. *Alewine v. City Council of Augusta,* 505 F.Supp. 880, 889 (S.D. Ga.1981). Exercising pendent jurisdiction over the municipal ordinance claim, the district court awarded partial backpay to the plaintiff bus drivers for hours worked in excess of forty per week since May 1, 1976. The court determined that, in·view of the City of Augusta's good faith throughout the time period relevant to the lawsuit, equity required an award of less than full backpay for violation of the municipal ordinance. Thus, the court limited the plaintiffs' recovery to two-thirds of the back pay sought. 505 F.Supp. at 893–94. The plaintiff bus drivers bring this appeal.

In a similar case, C.D. Joiner and a class of employees of the Macon Transit System sued the City of Macon (Macon) seeking a monetary recovery for hours worked in excess of forty per week since May 1, 1976, and a permanent injunction compelling Macon to pay time and one-half for overtime in the future. The plaintiff class alleged that a public transit system such as that in Macon, which serves only a portion of the community's citizens, is not a traditional governmental function. Taking the contrary position, Macon contended that employees of a publicly-owned mass transit system provide a traditionally governmental service and are therefore not covered by the FLSA. Even if public mass transit were considered a traditional governmental function, Macon argued that the invalidation of the overtime provisions to certain state and local governmental employees in *National League* precludes application of those provisions to all local government employees in the absence of a constitutionally valid amendment to the FLSA.

The district court found that the City of Macon's urban mass transit system is not an integral operation in the areas of traditional governmental functions and therefore held the overtime provisions of the FLSA constitutionally inapplicable to the plaintiff class of municipal transit employees. In addition, the district court rejected the City of Macon's argument that, because the overtime provisions of the FLSA have been held inapplicable to certain state and local governmental employees, the overtime provisions are inapplicable to all such employees in the absence of a congressional re-enactment of a constitutionally valid amendment. Citing the FLSA's severability clause,[2] which calls for application in the event the FLSA is found unconstitutional as applied to certain employees, the district court entered partial summary judgment for the plaintiff class of employees.[3] The City of Macon brings this appeal.

### B. *Facts*

*Alewine v. City Council of Augusta*

Prior to 1950, local bus service in Augusta was provided by the Georgia Power Company. In 1950, the Augusta Coach Company, a privately-owned corporation, purchased the service from Georgia Power and began operating local bus service under a franchise granted by the City of Augusta. Cit-

---

frained from reasserting this argument on appeal.

**2.** Title 29 U.S.C.A. § 219 (1975). *See* Part II–C of this opinion for the text of this section.

**3.** The district court certified this interlocutory appeal pursuant to 28 U.S.C.A. § 1292(b) (1966).

ing steady decreases in net income and working capital, Augusta Coach notified the City of Augusta in early 1973 that it intended to discontinue service. In April, 1973, the City of Augusta executed an option to purchase the assets of the Augusta Coach Company and for six months thereafter, Augusta provided operating assistance to Augusta Coach while an application for federal assistance under UMTA was prepared. By letter dated November 7, 1973, the City of Augusta purchased the assets of Augusta Coach with federal assistance and commenced local transit operations through the Augusta Transit Department on November 21, 1973.

Augusta stipulated that had it not been for the federal grant it would not have purchased the assets of the Augusta Coach Company. Subsequent applications for capital assistance and operating grants were approved by the Urban Mass Transportation Administration. Under the terms of the grant contract, the City of Augusta guaranteed that its acquisition of the bus system would not adversely affect the system's employees, that all existing rights and benefits of employees would be continued, and that it would enter into a collective bargaining relationship with the plaintiff bus drivers' union. This guarantee was required by UMTA, 49 U.S.C.A. § 1609(c) (1976).

The bus service provided by the Augusta Transit Department is similar to that provided by the Augusta Coach Company prior to the public takeover. Fixed route scheduled bus service and charter services are provided. The transit department retained the drivers and non-operating personnel employed by the Augusta Coach Company and continues to charge passengers a fare for riding the bus. Although non-operating employees are paid overtime compensation at time and one-half for hours beyond forty per work week, the plaintiff bus drivers are paid overtime only after forty-eight hours.

Since the City of Augusta's acquisition of the local transit system, the federal government through the Urban Mass Transportation Administration has been extensively involved with the system. The federal government has provided funding for approximately 80% of the transit department's total capital outlays. With federal assistance, Augusta has purchased new buses, constructed new bus shelters, and renovated the transit department's maintenance garage. One-half of the system's operating deficit is financed by the federal government. Furthermore, were it not for the operating grants from the federal government, the City of Augusta could not afford to operate the local transit system.

On this record, the district court held that the FLSA may not constitutionally apply to the plaintiff employees of the transit department because "the operation of the City Transit Department of Augusta is an integral operation of traditional governmental function." 505 F.Supp. at 889. The district court further held that Augusta had not waived its constitutional defense by accepting federal funds pursuant to the UMTA, 49 U.S.C.A. § 1602 (Supp.1982), and that the terms of the agreement between Augusta and the federal government did not require compliance with the FLSA. Recognizing the difficulty of the question and the sparse guidance provided by *National League,* the district court concluded, however, that traditional governmental functions need not be "time honored, hoary, or historic," but include "those which the public has come to expect and demand in light of the change of times and needs of society." 505 F.Supp. at 889. Relying in part upon *Amersbach v. City of Cleveland,* 598 F.2d 1033 (6th Cir.1979), the court determined that a municipal transit system, like the public airport in *Amersbach,* qualifies as a traditional function because (1) it benefits the whole community; (2) it is available to the public at a small cost; (3) it is undertaken for public service rather than financial gain; and (4) the municipality is the principal provider of the bus service and is particularly suited to provide the service. As mentioned above, the district court did award backpay at a reduced rate based on the Augusta municipal ordinance which provides the same overtime scale as the FLSA.

*Joiner v. City of Macon*

Prior to December 31, 1972, the Bibb Transit Company, a private corporation, owned and operated the public transit facilities in Macon pursuant to a franchise granted by the City of Macon. Bibb Transit notified the City of Macon on November 23, 1971, and again on August 29, 1972, that it intended to cease operations and surrender its franchise due to financial exigency. As promised, Bibb Transit ceased operations on December 31, 1972, and for the next two weeks, Macon was without transit service. On January 15, 1973, Bibb Transit agreed to resume operations for two months in return for a $25,000 operating subsidy made available to Macon by the State of Georgia.

In accordance with the terms of a city council resolution passed on March 6, 1973, Macon purchased and assumed possession of the assets of the Bibb Transit Company. Macon then commenced operation of the transit system as Macon Transit System. The eleven routes served by Macon Transit are basically the same as those provided by Bibb Transit when it ceased operations in 1972.[4] Out of a population of approximately 100,000, Macon Transit serves approximately 8,900 fares per day. The district court found that the typical passenger is female (66%), black (89%), middle-aged (80%), low income (80%), and "transit captive" (95%), that is, living in a household without an automobile available to it. Approximately 20% of all passengers are going to and from work.

Macon Transit System is funded through fares, charter income, advertising revenues, and operating subsidies provided by the City of Macon. In addition, Macon has obtained federal revenue sharing funds and state grants to cover capital outlays. Macon applied to obtain federal funding for Macon Transit pursuant to the Urban Mass Transportation Act (UMTA), 49 U.S.C.A.

§ 1602 (Supp.1982). The application was denied because Macon failed to comply with section 13(c) of the UMTA, 49 U.S.C.A. § 1609(c) (1976), relating to protections for employees. *See City of Macon v. Marshall,* 439 F.Supp. 1209 (M.D.Ga.1977). Consequently, the system operates at a substantial loss. No other transit services are offered by public or private concerns within the City of Macon.

Based on these facts, the district court held that the City of Macon must comply with the overtime provisions of the FLSA. The district court determined that Macon Transit was not a traditional governmental function because of its close resemblance to the commercial activities of a private business. The court noted that the routing, scheduling, and administration of Macon Transit continued in the same fashion as that of its predecessor, the Bibb Transit Company. The district court concluded that municipal transit is precisely the kind of state activity subject to federal regulation. The district court further concluded that compliance with the FLSA would not directly displace Macon's ability to structure employment relationships with transit employees because the large majority of transit systems throughout the country provide overtime pay for work in excess of forty hours per week without apparent disruption.

On appeal, all parties agree that the question of law before us is not dependent upon the specific facts regarding Augusta's or Macon's transit system. Macon contends that the district court misread *National League* in holding that publicly-owned mass transit is not a traditional governmental function. According to Macon, compliance with the FLSA's overtime requirements displaces a municipality's ability to structure employer-employee relationships. Macon contends that it is this function that is

---

4. On May 1, 1981, the City of Macon transferred all of its interest in the transit system to the Macon-Bibb County Transit Authority which was created at the 1980 session of the Georgia General Assembly. Ga.Laws 1980, p. 4313 *et seq.* The plaintiffs then became employees of the Transit Authority and their claims for over-

time wages were transferred to the Authority. However, as part of the process of setting up the Authority, the City agreed to remain responsible for all pending lawsuits including the instant case and will be liable for any amounts found due and owing to its former employees up until May 1, 1981.

essential to a municipality's independent existence and traditionally governmental under the reasoning of *National League.* The plaintiff class of employees in *Joiner v. City of Macon* argues that Macon's construction of *National League* immunizes from federal regulation virtually any essential activity performed by a governmental body. The plaintiff class further argues that Macon's failure to focus on mass transit from a historical perspective ignores the emphasis placed on tradition in *National League.*

The plaintiff class of bus drivers in *Alewine v. City Council of Augusta* also contends that the district court misread *National League* in finding that publicly-owned mass transit is a traditional governmental function. The Augusta plaintiff class argues that because state and local governments became involved in urban mass transit primarily because of federal funding beginning in 1964, local mass transit cannot be deemed traditionally governmental in any sense of the term.

## II. DISCUSSION

### A. *The Fair Labor Standards Act*

In 1938 Congress enacted the Fair Labor Standards Act requiring employers covered by the Act to pay employees minimum wages plus overtime at one and one-half times their regular rate of pay for hours worked in excess of forty per work week. 29 U.S.C. §§ 206, 207 (1940 ed.). The United States Supreme Court upheld the Act as a valid exercise of congressional authority under the commerce power. *See United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941). The FLSA as originally enacted specifically excluded from the term "employer" states and their political subdivisions. 29 U.S.C. § 203(d) (1940 ed.). With amendments in 1961, Congress extended coverage of the minimum wage and overtime provisions to certain types of public employers. The 1961 amendments extended coverage to those persons employed in enterprises engaged in commerce or in the production of goods for commerce. 29 U.S.C. §§ 203(r), 203(s), 206(b), 207(a)(2)

(1964 ed.). In 1966 Congress again amended the definition of "employer" and removed the exemption previously extended to the states and their political subdivisions with respect to employees of state hospitals, institutions, and schools. 29 U.S.C. § 203(d) (1964 ed. Supp. II). These amendments were upheld against constitutional attack in *Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968).

In 1974 Congress enacted the most recent in the series of broadening amendments to the FLSA. By those amendments, the definition of "employer" specifically includes "a public agency," which is defined as including "a state or political subdivision thereof." 29 U.S.C. §§ 203(d), (x) (1970 ed. Supp. IV). By the 1974 amendments therefore, Congress removed the exemption previously afforded states and their political subdivisions and imposed upon almost all public employment the minimum wage and maximum hour requirements previously restricted to employees of private entities engaged in interstate commerce. The 1974 amendments, in addition to extending the FLSA's coverage to most public employees, also repealed the special overtime exemption for mass transit personnel. *See* 29 U.S.C. § 213(b)(7) (1970 ed. Supp. IV). The Supreme Court addressed the constitutionality of these amendments in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

In *National League,* individual states, cities, and organizations brought suit against the Secretary of Labor to test the validity of the 1974 amendments extending the statutory minimum wage and maximum hours provisions to employees of states and their political subdivisions. Acknowledging that traditional governmental activities which affect interstate commerce would be within the reach of congressional power under the Commerce Clause if performed by private entities, the Court stressed, however, that the tenth amendment imposes an affirmative limitation on the exercise of the commerce power. The Court stated that Congress cannot, consistent with the tenth amendment, enact legislation which de-

prives the states of those attributes "'essential to [their] separate and independent existence.'" *National League,* 426 U.S. at 847, 96 S.Ct. at 2472 (*quoting Coyle v. Smith,* 221 U.S. 559, 580, 31 S.Ct. 688, 695, 55 L.Ed. 853 (1911)). The Court held that "insofar as the challenged amendments operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by art. I § 8, Cl. 3." 426 U.S. at 852, 96 S.Ct. at 2474 (footnote omitted). As examples of integral governmental functions, the Court listed fire prevention, police protection, sanitation, public health, and parks and recreation. The Court noted that "[t]hese examples are obviously not an exhaustive catalogue of the numerous line and support activities which are well within the area of traditional operations of state and local governments." 426 U.S. at 851 n. 16, 96 S.Ct. at 2474 n. 16. By specifically overruling *Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), the *National League* Court implicitly included public schools and hospitals as examples of other traditional operations of state and local governments.

The Supreme Court summarized its holding in *National League* in *Hodel v. Virginia Surface Mining & Reclamation Assoc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). The Court concluded that *National League* imposes a three-part test for determining whether commerce clause legislation transgresses the tenth amendment:

> [I]n order to succeed, a claim that congressional commerce power legislation is invalid under the reasoning of *National League of Cities* must satisfy *each* of three requirements. First, there must be a showing that the challenged regulation regulates the "States as States." Second,

the federal regulation must address matters that are indisputably "attribute[s] of state sovereignty" and third, it must be apparent that the States' compliance with the federal law would directly impair their ability "to structure integral operations in areas of traditional governmental functions."

452 U.S. at 287–88, 101 S.Ct. at 2366 (citations omitted).[5] It must be noted that the *Hodel* reiteration of the holding in *National League* is useful only when determining whether a particular federal regulatory scheme is unconstitutional under *National League.* The Supreme Court already applied the three *Hodel* standards to the FLSA in *National League,* and concluded that the attempted extension of the FLSA was not within the authority granted Congress by the Commerce Clause. Thus, *Hodel* merely provides guidance in determining whether other federal regulatory schemes, such as the Surface Mining Control & Reclamation Act in *Hodel,* are constitutionally barred by the tenth amendment when analyzed under the same guidelines as the FLSA amendments in *National League.* *Hodel* offers little guidance for the identification of traditional governmental functions. For that, we turn elsewhere.

### B. *Publicly-owned Urban Mass Transit—A Traditional Governmental Function?*

The distinctive characteristic of those "protected" activities identified in *National League* as traditionally governmental is that they are all functions which the states have historically provided their citizens. In describing the state and local functions immune from federal regulation under the FLSA, the *National League* Court repeatedly employed the adjective "traditional."[6] Only through gross oversight could

**5.** Political subdivisions are accorded the same status as states under National League. *See* 426 U.S. at 855 n. 20, 96 S.Ct. at 2476 n. 20; *Williams v. Eastside Mental Health Center,* 669 F.2d 671, 677 n. 7 (11th Cir.), *cert. denied,* ——— U.S. ———, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982).

**6.** *See, e.g.,* 426 U.S. at 849, 96 S.Ct. at 2473: "The degree to which the FLSA amendments

would interfere with traditional aspects of state sovereignty can be seen even more clearly upon examining the overtime requirement of the Act"; 426 U.S. at 851, 96 S.Ct. at 2474: "it is functions such as these which governments are created to provide, services such as these which the States have traditionally afforded their citizens"; 426 U.S. at 851 n. 16, 2474 n. 16: "These examples are obviously not an ex-

we ignore the conceptual attribute of "traditional" when determining whether public mass transit is an integral governmental function.

A number of courts have confronted this issue and have concluded that the maximum hour provisions of the FLSA cannot constitutionally be applied to public transit employees. *See, e.g., Molina-Estrada v. Puerto Rico Highway Auth.,* 680 F.2d 841 (1st Cir.1982); *Dove v. Chattanooga Transp. Auth.,* 539 F.Supp. 36 (E.D.Tenn.1981), *appeal docketed,* No. 81–56–36 (6th Cir. Sept. 2, 1981).[7] We choose not to follow these decisions, however, in light of *United Transp. Union v. Long Island R.R.,* 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982). In *Long Island R.R.,* the Supreme Court unanimously reversed the Second Circuit and held that a state-owned and operated railroad primarily engaged in commuter transportation in metropolitan New York City is not a traditional government function within the meaning of *National League.* The Court concluded that the tenth amendment did not bar application of the Railway Labor Act (including its right to strike) to employees of the commuter railroad. Just as we do here, the *Long Island R.R.* Court focused on that prong of the *Hodel* standard which examines whether compliance with the federal statute in question directly impairs the state's ability " 'to structure integral operations in areas of traditional functions.' " *Long Island R.R.,* 455 U.S. at 684, 102 S.Ct. at 1353, 71 L.Ed.2d at 553 (*quoting National League,* 426 U.S. at 852, 96 S.Ct. at 2474).

Significant to the *Long Island R.R.* Court's determination that a publicly-operated commuter railroad is not a traditional governmental function is the fact that passenger transit operations, unlike those traditionally-public activities listed in *National League,* have historically been performed by the private sector. Emphasizing that the Second Circuit's distinction between freight carriers and passenger railroads did not justify a contrary result, the Court stated:

> Operation of passenger railroads, no less than operation of freight railroads, has traditionally been a function of private industry, not state or local governments. It is certainly true that some passenger railroads have come under state control in recent years, as have several freight lines, but that does not alter the historical reality that the operation of railroads is not among the functions *traditionally* performed by state and local governments. Federal regulation of state-owned railroads simply does not impair a State's ability to function as a State.

*Long Island R.R.,* 455 U.S. at 686, 102 S.Ct. at 1354, 71 L.Ed.2d at 554 (footnote omitted).

The result in *Long Island R.R.* has prompted a reversal in a case presenting the issue that is before us. In *Kramer v. New Castle Area Trans. Auth.,* 677 F.2d 308 (3rd Cir.), cert. denied, —— U.S. ——, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983), the Third Circuit reversed the district court basing its decision squarely upon *Long Island R.R.* The Third Circuit held that the operation of a public mass transit system is not a function traditionally performed by state and local governments so as to pre-

---

haustive catalogue of the numerous line and support activities which are well within the area of traditional operations of state and local governments"; and 426 U.S. at 852, 96 S.Ct. at 2474: "Integral operations in areas of traditional governmental functions . . . . "

**7.** In *Molina-Estrada,* part-time highway construction employees sued the Authority for additional wages under the FLSA. The First Circuit held that the activities of the Authority were an integral part of the Commonwealth Government and could therefore be termed traditional governmental functions. Although the record was unclear as to the Authority's actual activities, the court noted that "the Authority arranges for the building of roads, sometimes builds roads itself, operates toll roads, keeps its roads in repair and (we take appellants' word for it) operates some parking lots and plans to build a mass transit system." 680 F.2d at 845. Because a public mass transit system was listed and referred to by the parties as only a possibility, the Third Circuit omitted from discussion of the *National League* analysis any mention of public mass transit as a traditional governmental function.

vent application of the FLSA's overtime provisions to the bus operators employed by the New Castle Area Transit Authority. Unpersuaded by the reality that mass transit systems are being taken over by municipalities and public transportation authorities with increasing regularity, the *Kramer* court stated that "[s]tates are not free to assume functions historically performed by the private sector and thereby insulate those activities from federal regulation of interstate commerce." 667 F.2d at 309.

More damaging to the cities' position in the instant case is the action taken by the Supreme Court in *Donovan v. San Antonio Metropolitan Trans. Auth.,* —— U.S. ——, 102 S.Ct. 2897, 73 L.Ed.2d 1309 (1982). In that case, the district court held that local public mass transit systems constitute integral operations in areas of traditional government functions under *National League* and, therefore, the Secretary of Labor cannot enforce the minimum wage and overtime provisions of the FLSA against local public mass transit systems. *San Antonio Metropolitan Trans. Auth. v. Donovan,* Civ. No. SA–79–CA–457 (W.D.Tex. Nov. 17, 1981). The government appealed the decision directly to the Supreme Court pursuant to 28 U.S.C.A. § 1252 (1979). The Supreme Court vacated the district court's judgment and remanded the case "for further consideration in light of *United Transportation Union v. Long Island R.R. Co.,* 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982)." —— U.S. at ——, 102 S.Ct. at 2897, 73 L.Ed.2d at 1309. By implication therefore, the Supreme Court considers *Long Island R.R.* of critical importance to the disposition of this issue.

Summarizing the holding of *National League*, the *Long Island R.R.* Court stated that the

> emphasis on traditional governmental functions and traditional aspects of state sovereignty was not meant to impose a static historical view of state functions generally immune from federal regulations. Rather it was meant to require an inquiry into whether the federal regula-

tion affects basic State prerogatives in such a way as would be likely to hamper the state government's ability to fulfill its role in the Union and endanger its "separate and independent existence."

455 U.S. at 686–687, 102 S.Ct. at 1354–55, 71 L.Ed.2d at 554 (*quoting National League,* 426 U.S. at 851, 96 S.Ct. at 2474). Despite the intimations to the contrary, however, the *Long Island R.R.* Court found it extremely difficult to overlook the "historical reality" that operation of railroads have traditionally been performed by private industry. *Kramer,* 677 F.2d 308, 309.[8]

■ Historically, mass transit systems have been owned and operated by private companies. Public ownership is a fairly recent development. As late as 1960, 95% of local transit services were privately-owned and operated. H.R.Rep. No. 204, 88th Cong. 2nd Sess. *reprinted,* [1964] U.S. Code Cong. & Ad.News, 2569, 2590. By 1967 the shift from private to public ownership had accelerated to the point that over 50% of transit riders were carried by publicly-owned transit systems. *American Public Transit Association, Transit Fact Book* 55 (1978–79 ed.). By 1978 publicly-owned systems generated 90% of all total operating revenues, and carried 91% of all passengers conveyed by American transit. *Id.* Recent studies indicate, however, that between 45% and 52% of all transit operations in the United States are still privately-owned. U.S. Dept. of Transportation, Urban Mass Transportation Administration, *A Directory of Regularly Scheduled, Fixed Route, Local Rural Public Transportation Service,* 6 (1980); U.S. Dept. of Transportation, Urban Mass Transportation Administration, *A Directory of Regularly Scheduled, Fixed Route, Local Public Transportation Service,* 17 (1979). The recent conversion of mass transit systems from private to public ownership has been accomplished in many instances through the impetus of federal funding. The City of Augusta is a prime example. Finding the nation's transit systems in a state of deterioration, Congress enacted the Urban Mass Transportation Act

---

**8.** *See, e.g., Long Island R.R.,* 455 U.S. at 686, 102 S.Ct. at 1354, 71 L.Ed.2d at 554.

(UMTA) to provide massive federal financial assistance "to State and local governments and their instrumentalities in financing [transit] systems, to be operated by public or private mass transportation companies as determined by local needs." 49 U.S.C.A. § 1601(b)(3) (1976). Through UMTA, local governments with transit operations are eligible to receive up to 80% of capital outlays, including the cost of acquiring private systems and capital improvements, and up to 50% of operating expenses. 49 U.S.C.A. §§ 1603(a), 1604(e) (1976 & Supp. III 1979). The City of Macon acquired the assets of Bibb Transit Co. and took over operation of mass transit in Macon without the use of UMTA funds. Although contrary to the process through which Augusta acquired its transit system, this fact does not affect the result we reach today.

Like the Third Circuit, we are of the opinion that expanding state involvement in mass transit does not alter the historical reality of the fact that mass transit is not a function traditionally performed by the state or its subordinate political bodies. *Kramer*, 677 F.2d 308, 310. As explained in *Kramer*,

the states are precluded from claiming, at this late date, that mass transit is a service which they traditionally provide. Tradition must be gauged in light of what actually happened, and what happened is a federal program of local transit service in which the state participate as late comer junior partners. There is, therefore, no tradition of the states *qua* states providing mass transportation. Moreover, since it is undisputed that the national government can set the employment relations in the area of mass transit, it would be unjustified to allow the states, by acquiring functions previously performed by the private sector, to erode federal authority in this area.

677 F.2d at 310 (footnote omitted).

The evidence of "transit captive" citizens in Macon does not change our view. Although a small percentage of Macon's population require public transit, the over-whelming majority of Macon's inhabitants rely upon their own automobiles for transportation. The fact that mass transit is a necessity for a segment of the population does not mean that a municipality's providing of transit service automatically turns the service into a traditional function of government. Our result is not altered by the probability that private transit companies are "doomed to extinction," thus requiring local governments to shoulder the burden abandoned by the private sector. *See Kramer*, 677 F.2d 308, 310 n. 1. As the statistics set out above indicate, local mass transit has historically been a function of the private sector.

When analyzed together, the similarities between the Long Island Railroad, the Macon Transit System and Augusta Transit Department reinforce our decision that the FLSA is constitutionally applicable to the plaintiff classes of bus operators. All three systems primarily involve the transportation of commuter passengers within an urban metropolitan area. Like the commuter train service of the Long Island Railroad, Macon and Augusta's transit systems had been privately-owned and operated for years. The Long Island Railroad was acquired by the Metropolitan Transit Authority in 1966; Macon and Augusta purchased existing transit operations in 1973. Based on the Supreme Court's analysis in *Long Island R.R.*, we hold that the services provided by the Macon Transit System and the Augusta Transit Department cannot be classified as traditional governmental functions. Federal regulation of both transit systems through the FLSA does not impair Macon's or Augusta's ability to function as a municipality nor "endanger [their] separate and independent existence." *Long Island R.R.*, 455 U.S. at 687, 102 S.Ct. at 1355, 71 L.Ed.2d at 554 (*quoting National League*, 426 at 851, 96 S.Ct. at 2474).

### C. *Severability*

■ The City of Macon contends that because *National League* held the overtime provisions of the FLSA inapplicable to certain state and local governmental employees, the overtime provisions are therefore

inapplicable to all such employees in the absence of a congressional re-enactment of a constitutionally valid amendment to the FLSA. We disagree. As the district court correctly observed, *National League* did not entirely vitiate the 1974 amendments on minimum wage and overtime provisions. The amendments were found unconstitutional only "insofar as [they] operate to directly displace the state's freedom to structure integral operations in areas of traditional governmental functions . . . ." *National League,* 426 U.S. at 852, 96 S.Ct. at 2474. The Supreme Court recognized that the minimum wage and overtime provisions were still applicable to the states in areas which are not "integral parts of governmental activities." *National League,* 426 U.S. at 854 n. 18, 96 S.Ct. at 2475 n. 18. *See also Marshall v. City of Sheboygan,* 577 F.2d 1, 3–4 (7th Cir.1978). We hold that the FLSA's severability clause controls here: "If any provision of this chapter or the application of such provision to any person or circumstance is held invalid, the remainder of this chapter and the application of such provision to other persons or circumstances shall not be affected thereby." 29 U.S.C.A. § 219 (1975). Therefore, no congressional re-enactment is necessary for a constitutionally valid application of the FLSA's overtime provisions to the public employees involved in these cases.

### D. *Municipal Ordinance Claim in Alewine v. City Council of Augusta*

Because our holding recognizes that the plaintiff class of transit employees are due time and one-half overtime pay under the FLSA, we need not address the pendent municipal ordinance claim providing for a similar result under the Augusta City Code.

Suffice it to say here that equitable reduction of the proper amounts due is inappropriate under the federal statute. A dispute exists, however, as to the correct amounts due.[9]

It is our opinion that justice would be best served by further inquiry into the contentions raised by Augusta's motion to amend, for it appears that a substantial miscalculation has occurred. If this is the case, it would be manifestly unjust to hold the City of Augusta to the terms of the original stipulation. The law of this circuit is that "a party may be relieved of a stipulation 'to prevent manifest injustice' so long as 'suitable protective terms or conditions are imposed to prevent substantial and real harm to the adversary.'" *Equitable Life Assurance Soc. v. MacGill,* 551 F.2d 978, 984 (5th Cir.1977) (*quoting Laird v. Air Carrier Engine Serv.,* 263 F.2d 948, 953 (5th Cir. 1959)). On remand, the district court shall conduct further proceedings and, observing the guidelines quoted above, determine the correct recovery due under the overtime provisions of the FLSA.

### III. CONCLUSION

Based on the above, we affirm the district court's entry of partial summary judgment in *Joiner v. City of Macon* holding that the City of Macon is not exempt from the overtime provisions of the FLSA with regard to the operation of the Macon Transit System. That case is remanded to the district court for further proceedings on the remaining issues. We reverse the summary judgment entered in favor of the City of Augusta in *Alewine v. City Council of Augusta.* That case is remanded to the dis-

9. At a hearing on cross motions for summary judgment, the parties stipulated to a document prepared by the City of Augusta concerning back overtime pay due each plaintiff should he or she prevail. The stipulated amount in the aggregate was $98,428.97. After the district court used this amount to award plaintiffs a partial recovery based on the municipal ordinance, the City of Augusta timely filed a motion to amend the judgment under Fed.R.Civ.P. 52(b), and, in the alternative, a motion for trial pursuant to Fed.R.Civ.P. 59. As grounds for the motion, the City of Augusta contended that the stipulated figure had been miscalculated by approximately $28,000. The affidavit of the City of Augusta's Director of Personnel, which is attached to the motion, states that the stipulated recoveries were inflated in that no credit was given for wages paid at straight-time rate between the forty and forty-eight hours intervals. According to the affidavit, the correct total in the aggregate is $70,225.19. The district court denied the motion.

trict court for further proceedings consistent herewith.

AFFIRMED in part, REVERSED in part and REMANDED.