Dorothy BESTER, et al.,
Plaintiffs–Appellees,

v.

CHICAGO TRANSIT AUTHORITY,
Defendant–Appellant.

No. 88–1458.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 26, 1988.

Decided Oct. 4, 1989.

Donald G. Peterson, Schaffenegger, Watson & Peterson, Chicago, Ill., for Dorothy Bester, plaintiff-appellee.

James P. Daley, David M. Novak, and Jeffrey A. Blevins, Bell, Boyd & Lloyd, Chicago, Ill., for Chicago Transit Authority, defendant-appellant.

Before COFFEY, EASTERBROOK and KANNE, Circuit Judges.

KANNE, Circuit Judge.

In *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 554, 105 S.Ct. 1005, 1019, 83 L.Ed.2d 1016 (1985), the Supreme Court overruled *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) [1] and held

---

**1.** In *National League of Cities,* the Supreme Court held that the commerce clause did not empower Congress to extend the application of the Fair Labor Standards Act's minimum pay and maximum hour provisions to state and local governments' employees providing services in areas of traditional governmental functions.

426 U.S. at 852, 96 S.Ct. at 2474. Hence the 1974 Amendments to FLSA were invalid "insofar as [they] operated to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions...." *Id.*

that the minimum wage and overtime provisions of the Fair Labor Standards Act ("FLSA") applied to *all* state and municipal employees including those performing services classified as traditional government functions. Public entities providing schools, hospitals, fire prevention, police protection, sanitation, public health, and parks and recreation were no longer exempt from FLSA liability. To ameliorate the financial transition caused by *Garcia,* Congress enacted the Fair Labor Standards Amendments of 1985. The 1985 Amendments expressly eliminated retroactive liability for functions categorized as "traditional." The 1985 Amendments also provided a one-year grace period during which the states and their political subdivisions could not be held liable for minimum wage and overtime compensation violations by employees newly brought under the protection of those provisions of the Act by reason of the *Garcia* decision.

On February 14, 1986, Dorothy Bester representing a class of Chicago Transit Authority ("CTA") employees filed a cause of action against the CTA seeking to recover unpaid wages and unpaid overtime compensation. Specifically, the complaint alleged that CTA's repeated failure to compensate employees at a rate of time and one-half for all hours over 40 hours per week during the years of 1983 through 1986 violated the minimum wage and overtime pay provisions of the Fair Labor Standards Act.

The Chicago Transit Authority is a statutorily created, tax-exempt municipal corporation which operates a public mass transit system in the City of Chicago. The CTA moved for summary judgment arguing under the 1985 Amendments that it was a governmental entity entitled to immunity from FLSA liability for any alleged violation occurring before April 15, 1986.

Applying the test announced in *National League of Cities,* the district court held that neither the CTA's historical development nor the general industry history qualified the CTA for the exemption from liability under the minimum wage and overtime provisions of the FLSA. The district judge denied the CTA's motion for summary judgment and held, as a matter of law, that the operation of mass transit by the CTA was not a traditional government function. 676 F.Supp. 833 (N.D.Ill.1987). Upon the CTA's request and pursuant to 28 U.S.C. § 1292(b), Judge Zagel certified the issue raised in the summary judgment order for interlocutory review and we accepted the appeal.[2]

We agree with the district court that the correct legal analysis in this case is the traditional government function test[3] and, we find that the CTA does not perform a traditional government function. Therefore the CTA is subject to Sections 3 and 13(b)(7) of the FLSA.

## ANALYSIS

We begin our analysis with an examination of the provisions added to the Fair Labor Standards Act by the 1985 Amendments and the regulatory scheme under which the Act is applied.

Section 2(c)(1) of the 1985 Amendments dealing with liability and deferred payment states:

> No State, political subdivision of a State, or interstate governmental agency shall be liable under section 16 of the Fair Labor Standards Act of 1938 [29 U.S.C.

**2.** Judge Zagel certified the following question under 28 U.S.C. § 1292(b): "Is the defendant Chicago Transit Authority subject to the regulation of the Fair Labor Standards Act 29 U.S.C. Sec. 203 (1966) and 29 U.S.C. Sec. 213(b)(7) (1974) before April 15, 1986?"

**3.** The plaintiffs urge us to affirm the district court's determination on other grounds. First, the plaintiffs argue that *National League of Cities* is inapplicable because the Supreme Court has never considered the operation of mass transit as a traditional function entitled to immunity from federal regulation. *United Transp. Union v. Long Island R.R. Co.,* 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982). Second, the plaintiffs submit that Congress never granted nor intended that public rail be exempt from minimum wage and hour regulation by the FLSA 1966 and 1975 Amendments. Thus, they assert the CTA has been subject to the FLSA minimum wage and overtime compensation provisions ever since 1966. We decline the invitation to decide the merits of this case on these contentions.

§ 216] for a violation of section 6 ..., 7 ... of such Act [29 U.S.C. §§ 206 and 207] occurring before April 15, 1986, *with respect to any employee of the State, political subdivision, or agency who would not have been covered by such Act under the Secretary of Labor's special enforcement policy on January 1, 1985, and published in sections 775.2 and 775.4 of title 29 of the Code of Federal Regulations.*

Fair Labor Standards Amendments of 1985, Pub.L. No. 99–150, Sec. 2(c)(1), 99 Stat. 788–89 (1985) (amending 29 U.S.C. § 216) (set out as a note under 29 U.S.C. § 216 (supp. 1989)) (emphasis supplied). Sections 775.2 and 775.4 referred to in the 1985 Amendments were an attempt by the Labor Department to clarify what functions of state and local government fell under the "traditional government function" rubric for the purpose of determining FLSA liability. The regulations specifically embraced the test for minimum wage and overtime compensation announced in *National League of Cities.*

29 C.F.R. § 775.2 states:

(a) On June 24, 1976, the United States Supreme Court ruled in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, that the minimum wage and overtime compensation provisions of the Fair Labor Standards Act (FLSA) are not constitutionally applicable to the integral operations of the States and their political subdivisions in areas of traditional governmental functions. Such areas include, among others, schools and hospitals, fire prevention, police protection, sanitation, public health, and parks and recreation. They do not include, among others, the operation of a railway by a State; 426 U.S. at 854, n. 18, 96 S.Ct. at 2475, n. 18.

29 C.F.R. § 775.4 states in full:

(a) In the *National League* decision, it was made clear that schools and hospitals, fire prevention, police protection, sanitation, public health, and parks and recreation are traditional functions or activities of States and their political subdivisions.

(b) In addition, the Administrator [of the Wage and Hour Division of the Department of Labor] has determined that the following functions of a State or its political subdivisions are traditional. (From time to time, this section will be amended to list other such functions determined to be traditional.)

(1) Libraries

(2) Museums

Although these regulations were drafted originally as mere interpretive guidelines for the Department's Enforcement Policy, pursuant to the 1985 Amendments, they are given the force and effect of law by Congress. *Ridings v. Lane County, OR,* 862 F.2d 231, 234 (9th Cir.1988).

The Eleventh Circuit interpreted Section 2(c)(1) as follows:

The very words of Section 2(c)(1) demonstrate that the April 15, 1986 chronological threshold it sets for certain FLSA enforcement actions was not intended to limit the ability of state and local government employees working outside areas of traditional governmental function to bring suit to enforce the minimum wage/overtime compensation protections afforded them by the FLSA. On its face Section 2(c)(1) ... bars this action only if the [employees] were employed in *areas of traditional governmental function.*

*Ackinclose v. Palm Beach Co.,* 845 F.2d 931 at 937 (11th Cir.1988) (emphasis supplied); *see also Ridings v. Lane County, OR,* 862 F.2d 231, 234 (9th Cir.1988).

Section 7 of the 1985 Amendments, in clear and unambiguous language, states:

The [1985] amendments ... *shall not affect* whether a public agency which is a State, political subdivision of a State or an interstate governmental agency is liable under section 16 of the Fair Labor Standards Act of 1938 [29 U.S.C. § 216] for a violation of section 6, 7, or 11 ... [29 U.S.C. §§ 206, 207 or 211] occurring before April 15, 1986, with respect to any employee of such public agency who would have been covered by such Act under the Secretary of Labor's social enforcement policy on January 1, 1985, and

*published in section 775.3 of title 29 of the Code of Federal Regulations.*

Fair Labor Standards Amendments of 1985, Pub.L. No. 99–150, Sec. 7, 99 Stat. 791 (amending 29 U.S.C. § 216) (set out as a note under 29 U.S.C. § 216 (supp. 1989)) (emphasis added). The Report of the Senate Labor and Human Resources Committee explains that the 1985 "[A]mendments do not effect whether employees of state and local governments who are engaged in nontraditional functions as defined by the [Department of Labor] at 29 C.F.R. 775.3— *notably mass transit systems* —are covered by FLSA prior to April 15, 1986." S.Rep. No. 159, 99th Cong., 1st Sess., *reprinted in* 1985 U.S.Code Cong. & Admin. News 651, 663. The determination of "whether transit employees, prior to the decision in *Garcia* were entitled to FLSA compensation for overtime hours worked is still being litigated in federal court. *The amendments are intended to protect the rights of both sides to resolve their differences through litigation without taking a position in the matter.*" *Supra* at 663 (emphasis supplied).

Obviously, one of the problems we encounter in this appeal is that the operation of mass transit is not among those government functions specifically listed in §§ 775.2 and 775.4 as "traditional." In fact, 29 C.F.R. § 775.3 declares that the operation of mass transit is a nontraditional government function. However, Section 2(c)(1) does not incorporate Section 775.3 of the Secretary of Labor's Special Enforcement Policy. This omission and the legislative history of the Amendments make it clear, that notwithstanding the descriptive language in § 775.3, Congress decided to leave to the courts the question of whether the operation of mass transit systems is a traditional government function, independent of the position of the Department of Labor.

This assessment is consistent with the view taken in *Ridings v. Lane County, OR*, 862 F.2d 231, 234 (9th Cir.1988). Although the alleged FLSA violations that occurred in *Ridings* transpired prior to *Garcia* and the 1985 Amendments, the Ninth Circuit had to resolve the issue of Lane County's liability to former city investigators for the county prosecutor seeking compensation for alleged FLSA violations. The service which these employees provided was not classified as "traditional" in either Sections 775.2 or 775.4. *Id.* at 234. The Ninth Circuit found that the list in those sections was not exclusive because the regulation was drawn from the law as announced in *National League of Cities* and the court applied the test to determine whether these employees were entitled to compensation. Thus, the Ninth Circuit was compelled to determine whether the activity of a prosecutor's office was a traditional government function. The court answered "yes" and ruled that the employees of the prosecutor were not covered by the FLSA under the *National League of Cities* test. *Id.* at 234–35.

Also consistent with our assessment calling for judicial determination of traditional government functions is a decision of the Eleventh Circuit in *Ackinclose*. In that case, county water utility department employees filed suit seeking compensation for alleged FLSA violations occurring between January, 1983, and October, 1985.[4] The

---

**4.** *Ackinclose* is one of two cases addressing the issue of FLSA liability of public entities whose employees provide services not expressly declared exempt from the minimum wage and overtime provisions until April 15, 1986 under the 1985 Amendments. *Garcia v. San Antonio Metropolitan Transit Authority (SAMTA)*, 838 F.2d 1411 (5th Cir.1988) is the other case, however, we decline to follow that case. In *SAMTA*, employees of the mass transit system argued that the 1985 Amendments established a Congressional policy on retroactivity and thereby precluded the application of the federal common law doctrine of *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

The Fifth Circuit rejected the argument and applied the *Chevron* test reasoning that if Congress had addressed the retroactivity issue regarding the mass transit function, then the employees' argument that a statute should override the *Chevron* common law doctrine would have some force. However, the Fifth Circuit found no statute establishing a congressional policy on the retroactivity contrary to *Chevron*. In a footnote, the court of appeals interpreted Section 7 of the 1985 Amendments and found that the Congressional intent of Section 7 was not to take a position on the retroactivity of *Garcia*, except to eliminate liability for state agencies

lawsuit was dismissed for failure to state a claim upon which relief could be granted. There the district court based its dismissal on the premise that the employees' enforcement action was barred by Section 2(c)(1) of the 1985 Amendments because the action was filed before the expiration of the April 15, 1986, grace period. The Eleventh Circuit found this conclusion erroneous in light of the fact that the district court made no determination as to whether the employees worked in areas of traditional government functions as contemplated in *National League of Cities* and 29 C.F.R. §§ 775.2 and 775.4. *Ackinclose*, 845 F.2d at 936, 937–38. The court of appeals held that Section 2(c)(1) of the 1985 Amendments did not bar county water utility department employees from pursuing an enforcement action, "provided that the employees could establish that the work that they performed during the period at issue did not fall within an area of traditional governmental function." *Id.* at 938.

■ Based on Section 2(c)(1) of the 1985 Amendments, the regulations referred to therein, and the legislative history, we believe the district court, consistent with the *Ridings* and *Ackinclose* cases, correctly found that the legal debate of whether the operation of mass transit was entitled to exemption was to be judged under the principles of *National League of Cities*. Thus, we agree that a public entity, in this case the CTA, is not subject to FLSA liability for violations occurring before April 15, 1986, *if it provides traditional government services.*

■ Necessarily then, we turn to the task of determining whether the operation of a mass transit system by the CTA is a traditional government function. As Judge Zagel expressed, "[i]t is daunting to say the least, to set out on any analysis that a Supreme Court majority says is 'unsound

in principle and unworkable in practice' but this is, ... what Congress has required."

A determination of what constitutes a traditional government function depends, in great part, on an historical perspective.[5] In this regard, we note that the development of mass transit in Chicago does not significantly differ from the development of mass transit systems in other major cities in the United States. The City of Chicago permitted a company to construct a horse railway in the late 1850's. By 1861, three companies provided transportation by horse rail. The City of Chicago set the fares and retained the right to purchase the companies' assets. Toward the turn of the century, these companies possessed rights to operate street railways in specified areas of the city. A state statute authorized the city's actions and in 1899 conferred the power of eminent domain to the companies. However, the system of street railways developed problems and tighter regulation was inevitable. In 1902, municipal ownership was approved by the voters. An Illinois law to permit municipal ownership was enacted in 1903 but was struck down for transgressing state constitutional limits on the city debt. The City of Chicago then exercised the other option of strict public controls to achieve uniform service with a single fare and universal transfers under the auspices of one company. An ordinance to achieve this was passed in 1913.

A parallel development began in 1892 with the erection of the elevated railroad by other private companies which were reunified in a single rapid transit company. The elevated and surface systems already in receivership were replaced under a single company in 1930.

The single mass transit company was privately owned yet closely regulated. It constructed many projects required by the city. The city, for its part, was to con-

---

exempt from the FLSA under the Labor Department regulations. 838 F.2d at 1415 n. 3.

While the Fifth Circuit acknowledged that the 1985 Amendments did not take a position on retroactivity as to the public transportation function, 838 F.2d at 1413, our view is that such silence as to public transit was significant be-

cause the senate reports indicate that the fate of mass transit regarding FLSA liability is for the judiciary to resolve.

**5.** The historical background of the CTA is not in dispute and our description of it is drawn largely from that set forth in the district court order.

struct a new subway and create a city transit fund. The city had created subways before and in 1899 allowed street railways to use them. The private company was believed to have failed its promise to the City of Chicago in 1945 when the Chicago Transit Authority was created. Despite the fact that the operation of mass transit in Chicago began well over a century ago, those earlier providers of transportation were exclusively private companies. Even today several publicly regulated private companies furnish transportation to the citizens of Chicago.

We noted earlier that the particular historical development of the CTA is not notably distinguishable from the historical development of other public entities operating mass transit systems which have been deemed nontraditional. The Third, Sixth and Eleventh Circuits, in addressing whether mass transit is a traditional government function for the purpose of determining FLSA liability, have concluded that the history of mass transit systems in the United States has not qualified them as public entities carrying out such functions. *See, e.g., Kramer v. New Castle Area Transit Authority,* 677 F.2d 308, 309–10 (3rd Cir. 1982), *cert. denied,* 459 U.S. 1146, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983) (New Castle Area Transit Authority created in 1958); *Dove v. Chattanooga Area Regional Transp. Authority,* 701 F.2d 50, 51 (6th Cir.1983) (Chattanooga Area Regional Transportation Authority created in early 1970's); *Alewine v. City Counsel of Augusta,* 699 F.2d 1060, 1063–65 (11th Cir. 1983), *cert. denied,* 470 U.S. 1027, 105 S.Ct. 1391, 84 L.Ed.2d 781 (1985) (Macon Transit System and Augusta Transit Department both created in the early 1970's). Although these cases predate *Garcia,* their analysis is relevant to our inquiry since the *National League of Cities* test must be satisfied in order for the CTA to avoid liability under the Act.

While the concept of what is a traditional government function is not static, increased state and city involvement in mass transportation in recent decades does not change the reality that mass transit systems were historically owned and operated by private companies and therefore not a function traditionally provided by state or local government. *Kramer,* 677 F.2d at 310; *Dove,* 701 F.2d at 53; *Alewine,* 699 F.2d at 1068–69. Public ownership of mass transit in the context of a national historical prospective began too late, as the district court observed, to establish a traditional function for state or local governments. States and their political subdivisions are not at liberty to usurp functions historically performed by the private sector and thereby insulate those activities from federal regulation. *Kramer,* 677 F.2d at 310. As the Supreme Court has explained, "there is no justification for the rule which would allow the states, by acquiring functions previously performed by the private sector, to erode federal authority in areas traditionally subject to federal statutory regulations." *United Transp. Union v. Long Island R.R. Co.,* 455 U.S. 678, 687, 102 S.Ct. 1349, 1355, 71 L.Ed.2d 547 (1982).[6]

Certainly, in reviewing the evolution of mass transit in Chicago, we find that the State of Illinois and City of Chicago actively participated in its development. Nevertheless, the CTA has failed to demonstrate how the application of the minimum wage and overtime provisions of the FLSA will affect the basic prerogatives of the State of Illinois or the City of Chicago in such a way as to frustrate their ability to fulfill their role in our federal form of government and jeopardize their "separate and independent existence." *Long Island R.R. Co.,* 455 U.S. at 686–87, 102 S.Ct. at 1355 (citing *National League of Cities,* 426 U.S. at 851, 96 S.Ct. at 2474).

Moreover, the fact that mass transit is a necessity for a segment of the Chicago population does not mean that the govern-

---

**6.** In *Long Island R.R.,* the Supreme Court concluded that the operation of a passenger railroad was not among those government functions generally immune from federal regulation under *National League of Cities,* 455 U.S. at 688,

102 S.Ct. at 1355. This case, although helpful, is not dispositive because it dealt with the application of the Railway Labor Act to a state owned railway engaged in *interstate* commerce.

ment entity providing a transit service is a traditional function of government. *Alewine*, 699 F.2d at 1069, see also *Kramer*, 677 F.2d at 310. As the district court reasoned, the fact that numerous sources characterize the operation of mass transit by the CTA as an "essential" service[7] does not enhance the CTA's claim that it provides a traditional function. Indeed the operation of mass transit is essential to the public welfare of Chicago, but so is electric power, telephone services and natural gas. These services, despite extensive government regulation of those who provide them, are not, within the meaning of *National League of Cities*, a government function. We agree with Judge Zagel that public importance of a service may justify close government regulation of the providers of that service yet government regulation does not necessarily transform a public service into a government function.

### CONCLUSION

We conclude that the district court did not err in determining that the CTA's operation of a mass transit system is not a traditional government function. It is therefore subject to the regulation of the Fair Labor Standards Act, 29 U.S.C. § 203 (1966) and 29 U.S.C. § 213(b)(7) (1974) before April 15, 1986. Accordingly, we AFFIRM the district court's denial of the CTA's motion for summary judgment and remand the case for further proceedings.

---

**7.** For example, the CTA refers to the Illinois state constitution which declares public transportation services "an essential public service" and the state statute speaks of "an essential public and governmental function." Similar phrases are found in judicial opinions as well as opinions from the courts of other states. Even members of Congress have expressed the same thought.